**In the Matter of ALL–WAY SERVICES, INC., Debtor in Possession.**

**Bankruptcy No. 87–00367.**

United States Bankruptcy Court, E.D. Wisconsin.

May 14, 1987.

Jerome R. Kerkman, Milwaukee, Wis., for All-Way Services, Inc.

Maxine White, Milwaukee, Wis., for U.S. Dept. of Justice—Milwaukee.

James Klein, Washington, D.C., for I.R.S., Asst. Dist. Counsel.

Mary Bielefeld, Washington, D.C., for U.S. Dept. of Justice—Washington, D.C.

Andrew M. Barnes, Washington, D.C., for M & I Northern Bank.

DECISION *

RUSSELL A. EISENBERG, Bankruptcy Judge.

## FACTS

The Debtor in Possession, All-Way Services, Inc. ("All-Way") ("Debtor"), is a bus company engaged in the business of transporting school children in the Milwaukee area. On January 26, 1987, the Internal Revenue Service ("IRS"), without having filed a Notice of Lien, levied upon All-Way's bank accounts at M & I Northern Bank of Milwaukee, Wisconsin ("Bank"). Two days later, on January 28, 1987, All-Way filed a petition under Chapter 11 of the Bankruptcy Code. It also filed an adversary proceeding in which it sought to obtain the funds in the bank accounts.

The Court has been asked to decide which of the three, IRS, All-Way, or the Bank should be given the use of the funds on deposit in the Bank. Other issues include whether the IRS and the Bank are entitled to adequate protection for lost opportunity costs, and whether the IRS levy constituted a voidable preference. All-Way owed the IRS approximately $65,000. The amount requested by the IRS in its levy was $26,807.87. There was $20,820.14 in three accounts of All-Way in the Bank at the time of the levy: (1) a general account containing $20,192.16; (2) a payroll account containing $118.93; and (3) a corporate savings account containing $509.05. The funds in the general account were traceable to recent payments on account by the Milwaukee Public Schools. From time to time funds from the other accounts were deposited into the payroll account, which was used solely for payment of wages and employment taxes. The source of funds in the savings account is uncertain, but in all probability the source is proceeds of accounts.

At the time of the IRS levy, All-Way was indebted to the Bank on two separate loans in the total sum of $68,647.10, plus costs of collection and attorneys' fees. Most of All-

Way's assets had been pledged to the Bank as security for the two loans. The loans were cross-collateralized, and the collateral covered future advances. The Bank had a security interest in accounts, instruments, chattel paper, inventory, documents relating to inventory, equipment, fixtures and general intangibles. The promissory notes signed by All-Way provided for a right of set-off on all funds on deposit with the Bank, as well as a security interest and lien on any demand account or savings account of All-Way at the Bank. All-Way gave the Bank a lien on all money on deposit in the Bank.

All-Way daily transports several thousand students to and from school. Its principal contract is with Milwaukee Public Schools, but it also has contracts with a number of private and parochial schools in the Milwaukee area. A wholly owned subsidiary, All Ride Bus Services, Inc. ("All Ride"), provides exclusive school bus service for Jefferson, Wisconsin, transporting approximately three thousand children daily. On occasion, All-Way and All Ride temporarily exchange school buses.

All-Way's employees were scheduled to be paid on January 30, 1987, the gross payroll for that date being $22,097.15. Immediately upon All-Way filing its Chapter 11 petition on January 28, 1987, a large number of its licensed school bus drivers gave notice that they would quit if they were not paid on time. This meant that unless All-Way had immediate access to cash, it was not going to be able to operate for more than a day, and thousands of school children would be left stranded in the middle of the winter. The only possible source of funds was the money in All-Way's bank accounts, which had been levied upon by the IRS.

At All-Way's request, an emergency hearing was held on January 29, 1987. The fact that the hearing was conducted during a snow storm emphasized the imperative need for school bus service.

---

\* This case was decided from the bench at the close of all argument, with a statement that an opinion in accord with the oral decision would

follow. See *Elliott v. Chicago Motor Club Insurance*, 809 F.2d 347 (7th Cir.1987).

The right to the bank accounts was sharply contested at this initial January 29, 1987, hearing. Nevertheless, all parties were concerned that the affected school children should not be without transportation to and from school the following morning. The Debtor was seeking an order permitting the use of cash collateral and requiring the IRS to turn over all of the funds subject to its levy. The Bank believed the Debtor's financial condition was precarious, and the Debtor's ability to operate its business for any substantial period of time without impairing the Bank's collateral was doubtful. From the limited information that was available on such short notice, it appeared that the Bank was fully secured. At the conclusion of the hearing, it was agreed that the money which was the subject of the IRS levy could be used by the Debtor to meet its January 30, 1987, payroll. In exchange for its rights, if any, to those funds, the IRS was given a replacement lien on new accounts generated by the Debtor. The Bank was also given a postpetition security interest in the Debtor's assets, and the Debtor was restrained from further encumbering any of its assets without prior court approval. This resolved the Debtor's immediate cash needs, but not the legal issues raised by the parties.

The Debtor was directed to deposit all money received in an account at the Bank, deposit payroll taxes in a segregated account when wages were paid, keep post-petition taxes current, maintain and keep current its insurance and maintain the school buses in a safe condition at all times. In addition, the Court directed the Debtor to furnish the IRS and the Bank with all financial information that was available to it, or reasonably possible to obtain, and the Bank was directed to furnish the IRS with copies of its security agreements, financing statements, promissory notes and related documents and instruments. Finally, a trial was scheduled for Monday, February 2, 1987.

At the trial on February 2, 1987, the following matters were presented to the Court:

1. An IRS claim to the proceeds of All-Way receivables to the extent of $20,820.14;

2. A motion by the IRS for adequate protection including lost opportunity costs;

3. A motion by the IRS to require the Bank to marshal its assets;

4. A motion by the Bank for adequate protection, including lost opportunity costs; and

5. A motion by the Bank to require the Debtor to file a disclosure statement and plan within 28 days.

At the conclusion of the trial, the Court made detailed written findings of fact which supplement this decision.

From the information presented to the Court at the hearings on January 29, and February 2, 1987, the following facts appeared. The Debtor used trust fund taxes for operating purposes. Shortly before the petition was filed, the principal of All-Way substantially increased insurance for himself and for members of his family, who were key employees. That principal resigned, took a vacation of undetermined length in Florida, and failed to advise the new principal, his son, of important financial matters. The former principal continued to receive a salary of $60,000 a year.

After the levy was served upon the Bank, the Bank drafted a cashier's check in the sum of all monies held in the Bank. The Bank held the cashier's check for ten days pursuant to standard operating procedure to enable All-Way to challenge the levy if it chose to do so. The cashier's check was not forwarded to the IRS before the petition was filed.

The Bank is fully secured. Against a loan balance in excess of $68,650, its collateral includes 29 school buses worth $35,550 on a forced sale basis, generally collectible accounts in the amount of $82,000, a paramount lien on all but $118.93 of the $20,820.14 in the All-Way bank accounts, inventory, documents relating to inventory, other equipment, fixtures and general intangibles of unknown value, a guaranty of the former principal, Charles B. Monfre, and a

second real estate mortgage on Charles B. Monfre's residence with $57,500 of equity available to the Bank.

## RIGHTS TO, AND INTERESTS IN, THE BANK ACCOUNTS

The IRS claims that the Debtor has no rights to, nor interest in, any of the bank accounts following its levy, and the funds in the Bank are not property of the estate. This Court disagrees. In *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), the day prior to the commencement of the bankruptcy case, the IRS seized Whiting's tangible personal property. The Supreme Court ordered the IRS to return the property to the debtor.

The IRS desires to distinguish *Whiting Pools, Inc.* from the present case. The property seized in *Whiting Pools, Inc.* was tangible personal property; the property seized in the present case is an intangible, the interest of the Debtor in its bank accounts. The IRS argues that it is necessary for the IRS to sell tangible personal property before realizing on the property; it is not necessary to sell an interest in bank accounts.

In this [*All-Way*] case, the IRS did not have possession of the funds, and the cashier's check remained in the possession of the Bank without objection of the IRS.[1] The IRS never credited the amount subject to the levy to the taxpayer's indebtedness to the Service. The IRS does have a lien on the funds on deposit. Its lien may be avoidable as a preference, and its lien is subsequent to the lien of the Bank on all funds other than the $118.93 in the payroll account, which the IRS, but not the Bank, may attach. At this point in time, however, the lien remains, and the IRS is entitled to adequate protection. The IRS also contends that following the levy, the Bank was a mere custodian of the funds solely for the benefit of the IRS, and a custodian need not turn over funds to the debtor.[2]

The Bank was not a custodian of the funds in the three bank accounts solely for the benefit of the IRS, at least as the term "custodian" is used in bankruptcy as a word of art. The Bank may have been an involuntary payor to the IRS following the levy, and it may have been holding employee withholding taxes for the IRS' benefit pursuant to 26 U.S.C. Section 7501, and those employee withholding taxes may be excludable from this bankruptcy estate, but the Bank was not the IRS' sole custodian, as alleged by the IRS. The Bank did not lose its claim to the funds by virtue of the IRS levy. Following the levy, the Bank also held the funds for its own ultimate, if not immediate, benefit.

The IRS is relying upon *Phelps v. United States*, 421 U.S. 330, 95 S.Ct. 1728, 44

---

**1.** The uncontroverted testimony of a Bank officer was that the IRS permitted the Bank to hold on to the funds for a period of ten days, during which time a debtor could seek a court order preventing the Bank from transmitting the funds to the IRS.

**2.** The term "custodian" is defined by Bankruptcy Code Section [hereafter "Code"] Sec. 101(10):
"(10) 'custodian' means—
(A) receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under this title;
(B) assignee under a general assignment for the benefit of the debtor's creditors; or
(C) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors;"

Code Sec. 543 provides: "Sec. 543. Turnover of property by a custodian
(a) A custodian with knowledge of the commencement of a case under this title concerning the debtor may not make any disbursement from, or take any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, in the possession, custody, or control of such custodian, except such action as is necessary to preserve such property.
(b) A custodian shall—
(1) deliver to the trustee any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case; . . ."

L.Ed.2d 201 (1975) and upon *In re Debmar Corp.*, 21 B.R. 858 (Bankr.S.D.Fla.1982).

This Court respectfully declines to follow *In re Debmar*. *In re Debmar* was decided prior to *Whiting Pools* (supra). The money subject to the levy was actually paid to the IRS,[3] and "the effect of the payment to the IRS was to discharge the account debtor's and the bank's liabilities to Debmar." [4] The effect of the payment by Debmar to the IRS "was to reduce Debmar's tax liability, a situation completely different from that in *Whiting Pools* where the IRS would have to sell the levied-upon property and apply the proceeds to reduce the tax liability." [5] The IRS also filed six notices of federal tax lien against Debmar pursuant to I.R.C. Sec. 6323 of the Internal Revenue Code.[6]

The facts in the case before this Court are different. There was no payment to the IRS. The IRS did not credit the taxpayer with the funds subject to the levy. The IRS did not file any notice of federal tax lien. As was pointed out in *Federal Deposit Insurance Corporation v. O'Neil*, 809 F.2d 350 (7th Cir.1987),

... courts cannot write readable opinions without using general language. Lesson Number One in the study of law is that general language in an opinion must not be ripped from its context to make a rule far broader than the factual circumstances which called forth the language.

*Phelps* (supra) not only was decided prior to *Whiting Pools, Inc.* (supra), but it was a Bankruptcy Act case, not a Bankruptcy Code case, and its facts did not closely resemble those in this case. It also involved a then-important discussion of summary jurisdiction versus plenary jurisdiction.

In *Whiting Pools, Inc.* (supra), the Supreme Court twice made reference to *Phelps*. In footnote 13, *Phelps* was distinguished.

In footnote 18, the Supreme Court continued:

It could be argued that dictum in *Phelps v. United States*, 421 U.S. 330, 44 L Ed 2d 201, 95 S.Ct. 1728 (1975), suggests the contrary ... The Court determined that the levy transferred constructive possession of the fund to the IRS, thus ousting the bankruptcy court of jurisdiction. *Id.*, at 335–36, 44 L.Ed.2d 201, 95 S.Ct. 1728 [at 1732] ... The proposition is now irrelevant because of the expanded jurisdiction of bankruptcy courts under the Bankruptcy Code. See n. 13, supra.[7]

The ruling in *Matter of Bristol Convalescent Home*, 12 B.R. 448 (Bankr.D.Conn. 1981) is contrary to *In re Debmar* (supra). The IRS, in *Bristol*, argued that "the property levied upon is not property of the debtor's estate because its levy had the effect of placing the debt owed to BCH in the constructive possession of the United States." [8] The court ruled that the prepetition levy of the IRS did not have the effect of removing the levied-upon property from the debtor's estate, rendering it not subject to a turnover order of the bankruptcy court.

The court in *Bristol* cited five bankruptcy court decisions and one district court decision supporting its position, and pointed out four bankruptcy court decisions and one district court decision supporting the position of the IRS. The position of the IRS was based upon *Phelps* (supra), and the decision in *Bristol* was prior to *Whiting Pools, Inc.*[9]

The court in *Bristol* distinguished *Phelps*, by pointing out changes in the

---

3. *In re Debmar*, 21 B.R. 858, 859 (Bankr.S.D.Fla. 1982).

4. *Id.*, at 861.

5. *Id.*

6. *Id.*, at 859.

7. *Whiting Pools, Inc.*, 462 U.S. at 210, 103 S.Ct. at 2316.

8. *Matter of Bristol Convalescent Home*, 12 B.R. at 449.

9. At the time *Bristol* was decided, *Whiting Pools, Inc.* was at the bankruptcy court level [*In re Whiting Pools, Inc.*, 10 B.R. 755, 7 Bankr.Ct.Dec. (CRR), (Bankr.W.D.N.Y.1981) ]

Bankruptcy Code and stating that the holding of *Phelps* "is no longer the law"[10] as a result of Code Section 363(c) and (e).

In *In re Dunne Trucking Co.*, 32 B.R. 182 (Bankr.N.D.Iowa 1983), the IRS levied upon a general checking account. It demanded immediate delivery of the balance in the account. It took one day to complete the posting process. Early the next morning the Debtor filed a voluntary petition in bankruptcy. Later in the morning, the bank mailed its check to the IRS. The IRS did not have actual possession of the bank check at the time the petition was filed. The IRS did not give the taxpayer a Notice of Levy prior to the commencement of the bankruptcy case.

The IRS contended "that service of Notice of Levy, as provided for in I.R.C. Sec. 6331 amounted to a prepetition transfer of ownership, and that no rights remained in the account to pass to the debtor's estate."[11]

The court held:

... the Notice of Levy by itself did not extinguish the debtor's rights in the checking account ... [T]he account was property of the estate within the meaning of section 541 of the Bankruptcy Code ... [T]he account is property that the trustee may use, sell, or lease within the meaning of section 363 of the Bankruptcy Code ... [T]he account is ... subject to the turnover provisions of section 542 of the Bankruptcy Code.[12]

After analyzing the law, the court in *Dunne* rejected the IRS' argument. Relying upon *Whiting Pools, Inc.* (supra) and illustrating how the Bankruptcy Code changed the law since *Phelps* (supra), the court held that the general bank account was property of the estate. While this Court does not agree with a portion of the legal reasoning of *Dunne*, particularly the analysis of law pertaining to notice requirements to be given (according to *Dunne*) by the IRS[13], this Court comes to the same conclusion as did the court in *Dunne*.[14,15]

While "taxes are the life blood of government, and their prompt and certain availability an imperious need,"[16] the IRS cannot change the law to reach its laudable goal, notwithstanding its good intentions.

■ Property of the estate is broadly defined by the Code.[17] Legislative history indicates that it is intended to be comprehensive in scope.[18] Property of the estate encompasses all kinds of property, including intangible property and causes of action.[19] As was stated in *Whiting Pools, Inc.* (supra), "Both the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured

---

**10.** *Matter of Bristol Convalescent Home,* at 451.

**11.** *In re Dunne Trucking Co.,* at 186.

**12.** *Id.,* at 193–94.

**13.** In the case before this Court, there was no testimony that the IRS gave notice of a seizure to All-Way or to the debtor. The IRS did give a final notice of intention to levy. All-Way believed that it had an agreement with the IRS providing for the IRS to take no further enforcement action. The debtor argued that the IRS is estopped by its actions, and its lien is void. Since the outcome of the matters presently before this Court are not dependent on any such possible agreement, this Court at this time is declining to rule on those issues raised by the debtor.

**14.** The same conclusion was reached in *In re Suppliers, Inc.,* 41 B.R. 520 (Bankr.E.D.Ky. 1984). That case pertained to the prepetition seizure of an account by the IRS. It cited *In re Dunne* and quoted it extensively with approval.

**15.** The same conclusion was also reached in *Matter of Computer Management, Inc.,* 40 B.R. 201 (Bankr.N.D.Ga.1984), which also referred to *In re Dunne* with approval.

**16.** *Bull v. United States,* 295 U.S. 247, 259, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935).

**17.** "Code Sec. 541. Property of the estate
 (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held:
 (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of this case ..."

**18.** Notes of Committee on the Judiciary, S.Rep. No. 95–989, 1978 U.S.Code Cong. & Ad.News at 5787.

**19.** *Id.*

creditors suggest that Congress intended a broad range of property to be included in the estate."

■ An exception is the money in the payroll account. Those funds are held in trust for others, specifically the IRS and/or employees. Those funds are not property of the estate.[20,21] No such trust was imposed upon the funds in the general account nor upon the corporate savings account by designation or by practice.

■ This Court concludes that the funds seized by the IRS prepetition are subject to the provisions of Code Sec. 542(a). Nothing in the Bankruptcy Code or its legislative history indicates that Congress intended a special exception for the tax collector in the form of an exclusion from the estate of property seized to satisfy a tax lien.[22]

### DEBTOR'S REQUESTED SETOFF

■ The Debtor wants to set off against the taxes due and owing to the IRS an expected $18,000 refund from the IRS for gasoline taxes. The precise amount of the refund has not been determined, nor has the IRS as of the time of the trial acknowledged that a refund is a certainty. The Debtor cannot set off an unliquidated claim against the IRS against a sum certain due from the Debtor to the IRS. The request of the Debtor to do so is denied.

### DEMAND OF THE IRS FOR THE BANK TO MARSHAL ITS ASSETS

■ Since the Bank may be oversecured[23,24] in a sum sufficient to enable the Bank to be paid in full from collateral other than the Bank accounts, the IRS is entitled to a separate hearing on its demand for the Bank to marshal its assets. The IRS is not requesting a hearing at this time, as this case is not in a liquidation posture. Should that occur, a hearing will be scheduled promptly upon request of the IRS.

### IRS REPLACEMENT LIEN

Because of the unique circumstances of this case, at the first emergency hearing on January 29, 1987, the IRS agreed to permit the Debtor to use the funds subject to its levy to meet immediate needs. The IRS agreed to receive a replacement lien on other collateral. The Debtor is now using those funds and the property (accounts) subject to the replacement lien on an ongoing basis.

### IRS LEVY AS A PREFERENCE

The Debtor contends that the IRS levy on the bank deposits constitutes a voidable preference under Code section 547. Without relinquishing its position regarding the use of the bank deposits by the Debtor, the IRS is given a replacement lien on various assets. Whether this replacement lien should be avoided on the ground that the IRS levy constitutes a voidable preference is being reserved for decision at a later date.

---

**20.** *In re Minoco Group of Companies, Ltd.,* 799 F.2d 517 (9th Cir.1986); Notes of Committee on the Judiciary, S.Rep. No. 95–989.

**21.** It is necessary to look to state law to determine whether property is an *asset* of a debtor. *In re Brass Kettle Restaurant, Inc.,* 790 F.2d 574 (7th Cir.1986). The trust fund exception creates a situation where the funds in the payroll account are an asset of the debtor pursuant to state law, but are not property of the estate pursuant to bankruptcy law.

**22.** *Whiting Pools, Inc.,* 462 U.S. at 209, 103 S.Ct. at 2315–16.

**23.** This Court is mindful of *In the Matter of Glenn,* 796 F.2d 1144, 1146–47 (9th Cir.1986), in which the court pointed out "the danger of relying on technical idioms rather than law." The Court noted that the terms "undersecured" and "oversecured" creditor "have been used to describe various concepts," ... and "are not to be found in section 506," and they "have found their way into common legal parlance." ... "However, care must be taken lest the parlance take on a life of its own." The terms "oversecured" and "undersecured" as used in this Decision, are intended solely to be used in a non-technical context, and are not intended to be determinative of the rights of the parties. In this Decision, *claims* are referred to as "secured" or "unsecured." *Creditors* are referred to as "secured," "undersecured," or "oversecured."

**24.** See B. Weintraub and A. Resnick, *From the Bankruptcy Courts,* 19 U.C.C.L.J. 269 (1987).

## ADEQUATE PROTECTION

The bank accounts were cash collateral.[25] Both the Bank and the IRS had liens on the bank accounts. They are both entitled to adequate protection. Neither creditor consented to the use of the cash collateral without adequate protection, including lost opportunity costs.

Code section 361 gives guidance to the concept of adequate protection.[26] The term "adequate protection" is not defined in that Section of the Code, however, nor in any other Section of the Code. Neither the legislative history nor the Bankruptcy Code specifies which of the creditor's interests in property are to be protected, or how those interests are to be valued. The Code appears purposefully to be flexible in its approach to adequate protection. Section 361 states that "such adequate protection *may* be provided" in one of three specified modes. (emphasis added)[27]. Section 361 does not mandate using any one of the three modes. Code Sections 362, 363 and 364 do not mandate any form of adequate protection.

An analysis of the Code leads one to understand that while the concept of adequate protection is complex, its application is intended to be flexible and molded to the needs of an individual case so that the purposes of bankruptcy will be accomplished. Inflexible rules in theory may be easy to apply,[28] but, when applied, may result in needlessly failed reorganizations.

In considering adequate protection, there are two concepts of paramount importance. First, an overriding policy of bankruptcy is granting an honest individual debtor a "fresh start",[29] and the parallel policy of permitting businesses to continue to operate.[30] Second, the concept of adequate protection is derived from the Fifth Amendment[31] protection of property interests as enunciated by the Supreme Court.[32]

## LOST OPPORTUNITY COSTS

Both the Bank and the IRS have requested lost opportunity costs[33] as an

25. Code § 363(a)

26. Code "§ 361. Adequate protection
"When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
"(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extend that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
"(2) providing to such entity an additional replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
"(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

27. It is axiomatic that generally "may" is permissive, and "shall" is mandatory. See *United States v. Chavez*, 627 F.2d 953, 955 (9th Cir. 1980), and *United Hospital Center, Inc. v. Richardson*, 757 F.2d 1445, 1453 (4th Cir.1985).

28. Assuming that the courts do not carve out many judicial exceptions.

29. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934), states, "One of the primary purposes of bankruptcy act is to 'relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes'." (citing *Williams v. U.S. Fidelity & G. Co.*, 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915).

30. *Whiting Pools, Inc.*, 464 U.S. at 203, 103 S.Ct. at 2312–13, states, "By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H.Rep. No. 95–595, p. 220 (1977)."

31. U.S. Const. amend. V "No person shall ... be deprived of ... property, without due process of law ..."

32. Notes of Committee on the Judiciary, S.Rep. No. 95–989. See *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940), rehearing denied, 312 U.S. 711, 61 S.Ct. 445, 85 L.Ed. 1142 (1941); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

33. Perhaps the first federal decision approximating the term "adequate protection" was *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), in which Mr. Justice

element of adequate protection. Since the Bank is substantially oversecured and other forms of adequate protection should suffice, the Bank is not entitled to lost opportunity costs as a separate element of adequate protection. The IRS, however, is undersecured. Lost opportunity costs in some Circuits have been granted to undersecured creditors.

Four United States Courts of Appeals have ruled on the subject:

*In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984) [hereinafter *American Mariner*].

*Grundy National Bank v. Tandem Mining Corp.*, 754 F.2d 1436 (4th Cir. 1985) [hereinafter *Grundy*].

*In re Briggs Transportation Co.*, 780 F.2d 1339 (8th Cir.1985) [hereinafter *Briggs*].

*In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363 (5th Cir. en banc 1987) [hereinafter *Timbers of Inwood*].

The Seventh Circuit Court of Appeals, however, has not. Three of the four Courts of Appeals are in substantial disagreement.[34] The parties want a decision in the Seventh Circuit.

### American Mariner (9th Circuit)

The sole issue in *American Mariner* "is whether an undersecured creditor who is stayed by a bankruptcy petition from repossessing its collateral is entitled, under the concept of 'adequate protection', 11 U.S.C. section 361, 362, to compensation for the delay in enforcing its rights against the collateral." [35] That damage is the so-called "lost opportunity cost."

Because a creditor with a secured claim as the result of the automatic stay or court order loses its ability to liquidate the collateral and to apply the proceeds of the liquidation to the debt, the creditor loses its opportunity to loan again the funds at a profit. This results in an aberration in the anticipated time value of the original money lent from the secured lender to the debtor. At issue is whether that loss in the time value of money is compensable.

*American Mariner* ruled, that lost opportunity costs are to be awarded. *Timbers of Inwood* held that the adequate protection provisions of Code sections 362(d)(1) and 361 do not require periodic postpetition payments for interest or lost opportunity cost to an undersecured creditor. *Briggs* ruled that lost opportunity costs may, but need not be, awarded. *Grundy* agreed in principle with *American Mariner*, but differed on the timing. Both *American Mariner* and *Grundy* required "protection of such creditor's interest in the collateral on a present-value basis." [36]

More specifically, *American Mariner* held that a creditor is entitled to adequate protection of the value of its interest in property to the extent that the stay results in a decrease in the value of the creditor's interest in the property.[37]

The Court of Appeals, in *American Mariner*, stated, "In this case we are engaged in precisely the sort of case-by-case interpretation and development intended by Congress." [38]

According to *American Mariner*, 734 F.2d at 435,

calls "for interest to accrue from a date determined by taking the date of the petition and adding the usual time involved in repossession and sale of collateral." *Bankruptcy Service, L.Ed., Current Awareness Alert*, Feb., 1987, at 2.

Brennan stated in footnote 22, "It should be emphasized that in *Pennsylvania Coal [Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322] the loss of profit opportunity was accompanied by a physical restriction against the removal of the coal."

**34.** *Grundy* is in general agreement with *American Mariner*. *Grundy* deviates from *American Mariner* on the determination date of the payment of interest. *Grundy* provides for interest to commence at "a date determined by taking the date of the motion for relief from the automatic stay and adding to it the usual time involved in repossession [sic] and sale of collateral," in contrast to *American Mariner*, which

**35.** 734 F.2d at 427.

**36.** G. Treister, J. Trost, L. Forman, K. Klee and R. Levin, *Fundamentals of Bankruptcy Law*, (1986) § 5.01(g) at 205.

**37.** 734 F.2d at 430.

**38.** 734 F.2d at 431.

The secured creditor's right to take possession of and sell collateral on the debtor's default has substantial, measurable value. The secured creditor bargains for this right when it agrees to extend credit to the debtor and both parties consider the right part of the creditor's bargain. The right constitutes an 'interest in property' that is 'created and defined by state law,' and we are aware of no federal interest that requires this right of the secured creditor to go unprotected 'simply because an interested party is involved in a bankruptcy proceeding.' See *Butner v. United States*, 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–918, 59 L.Ed.2d 136 (1979).

The creditor's right to its "benefit of the bargain" is an important element of the judicial decisions in which lost opportunity costs were granted. Also important is the utilization of the ruling in *Butner*, that parties in bankruptcy should not receive "a windfall merely by reason of the happenstance of bankruptcy." [39] The Court of Appeals in *American Mariner* stated at 734 F.2d 435:

> To the extent that the debtor in bankruptcy can prevent the secured creditor from enforcing its rights against collateral while the debtor benefits from the creditor's money, the debtor and his unsecured creditors receive a windfall at the expense of the secured creditor.

*American Mariner* concluded by ruling that a secured creditor is entitled to adequate protection for the value of its lost opportunity costs. The court left open the determination of the method of providing adequate protection. The Court of Appeals in *American Mariner* agreed with the argument propounded by Professors Douglas G. Baird [40] and Thomas H. Jackson [41] that "the secured creditor must receive the economic equivalent of its state-law rights." [42]

There are problems in strictly following *American Mariner* in this [All-Way] case. There is nothing in any agreement between the Debtor and the IRS (or the Bank) specifically granting lost opportunity costs nor indicating that lost opportunity costs were part of the bargain. A lower rate of interest was not charged to the Debtor for granting lost opportunity costs. The filing of a petition under Chapter 11, although not expected when the loan was made, was a loan risk. Furthermore, since the time period during which the secured creditor needs adequate protection is brief, there may be no Fifth Amendment problem in not granting lost opportunity costs. Last, but certainly not least, once lost opportunity costs are granted, it may be impossible to unravel the granting of lost opportunity costs in the event of confirmation of a plan.

### Grundy (4th Circuit)

In *Grundy*, the court stated, "We think that the split in the authorities was correctly resolved in *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir. 1984)." [43] *Grundy* also stated:

> *American Mariner*, correctly we think, concluded that a secured creditor is entitled to the 'benefit of its bargain.' *Id.* at 435. This is to say that the secured creditor is entitled to be compensated for

---

**39.** *Id.,* at 435; *Butner v. United States,* 440 U.S. at 55, 99 S.Ct. at 918, 59 L.Ed.2d 136 (1979) (quoting *Lewis v. Manufacturers National Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)).

**40.** Professor of Law at University of Chicago.

**41.** Professor of Law then at Stanford University. Professor Jackson filed an amicus curiae brief in *American Mariner* in support of the position of the secured creditor. *American Mariner*, in footnote 10, page 435, made reference to the amicus curiae brief and to T. Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the Creditor's Bargain,* 91 Yale L.J. 857, 871–77 (1982).

**42.** Douglas G. Baird and Thomas H. Jackson, *Cases, Problems, and Materials on Bankruptcy,* 429, Little Brown and Co. (1985). The importance of *Butner v. United States* is a theme stressed by Professors Baird and Jackson, particularly the following statement in *Butner:* "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." 440 U.S. at 55, 99 S.Ct. at 918.

**43.** *Grundy,* 754 F.2d at 1440.

the use of its money when it is precluded from liquidating its debt.[44]

The court in *Grundy* also agreed with *American Mariner* in holding that "one method of providing adequate protection" is "requiring 'monthly interest payments at the market rate on the liquidation value of the collateral'."[45] Flexibility must be shown in fixing the interest rate, with interest commencing no sooner than the time the creditor requests relief from the automatic stay, with an additional delay to take into account "the time that would be consumed in repossession and sale of the collateral."[46]

### Timbers of Inwood (5th Circuit)

In this en banc decision, the court utilized a different method of analyzing the problem, and it came to a conclusion in contraposition to *American Mariner*. In a 9–1–5 decision written by the Honorable Carolyn Dineen Randall, the Fifth Circuit widely disagreed with *American Mariner*. The discussion in *Timbers of Inwood* began with the following language:

> We hold today that the adequate protection provisions of the Bankruptcy Code, §§ 362(d)(1) and 361, do not require periodic postpetition payments for interest or lost opportunity cost to an undersecured creditor to compensate it for the delay of the Chapter 11 reorganization proceeding during the pendency of the automatic stay.[47]

In support of its Decision, the court stated:

> The pervasive sentiment expressed by those who addressed the various family farm bankruptcy proposals before Congress was that the *American Mariner* requirement of payment of interest or lost opportunity costs as a form of adequate protection to secured creditors was

almost invariably fatal to the family farmer's prospects for reorganization; it is the rare family farm debtor who can make the lost opportunity cost payments required under *American Mariner*.[48]

The *Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986* gave family farmers needed relief. Congress, in Code section 1205, provided for specific forms of adequate protection for family farmers. No change was made for adequate protection provisions in Chapter 11 cases.

The court in *Timbers of Inwood* pointed out that creditors may move to lift the automatic stay pursuant to Code section 362(d)(2)[49]. It also stated, "Courts have consistently construed section 362(d)(2)(B) to require a showing by the debtor that there is a reasonable possibility of a successful reorganization within a reasonable time."[50] The Court cautioned that "early in the case," when the relief from stay hearings are usually held, "the bankruptcy court applies the 'reasonable possibility of successful reorganization' standard with somewhat more indulgence than would be appropriate if the motion were made at a later stage in the proceedings or if a similar issue were raised in the context of the full-blown hearing that attends a motion to dismiss or convert the case brought under section 1112."[51]

The court went on to state that creditors may bring a motion for conversion or dismissal.[52] Unfortunately for creditors with secured claims, courts are reluctant to grant relief from the automatic stay in the early stages of a case when the risks for creditors with secured claims often are the greatest.

As *American Mariner* gave solace to debtors, *Timbers of Inwood* gave solace to creditors, by stating:

---

44. 754 F.2d at 1441.

45. *Id.; American Mariner,* 734 F.2d at 435 in footnote 12, took the same approach.

46. *Id.*

47. 808 F.2d at 363–64.

48. *Id.,* at 364–65.

49. *Id.,* at 370.

50. *Id.*

51. *Id.,* at 371.

52. *Id.*

In the case of most Chapter 11 debtors ... a plan of reorganization can be effectuated, if at all, within a matter of months, not years. An occasional Chapter 11 debtor, for example, one with a complex debt structure or multifarious business problems, may require more time. However, the existence of such a debtor is the exception, not the rule. The charge to the bankruptcy judge under § 1112, then, is to evaluate each debtor's viability and rate of progress in light of 'the best interest of creditors and the estate." [53,54]

The court went on to give further comfort to creditors by stating:

Section 1121 [55] was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.[56]

Our brief review of the important creditor-protection provisions of the Bankruptcy Code demonstrates the inaccuracy of United's [Movant's] assertion that our construction of the adequate protection provisions leaves the secured creditor unable to enforce its rights. Congress clearly intended to provide a wide range of remedies for the secured creditors of a debtor that does not have a reasonable possibility of reorganizing or that unreasonably delays in its efforts to reorganize. It remains for the courts to effectuate those remedies.[57]

The court concluded with the following:

The creditor-protection provisions of the Bankruptcy Code reviewed in Part II of this opinion can be made meaningful only by bankruptcy judges who are equally sensitive to the need for creditor protection as to the need for protecting the debtor's right to reorganize.

A principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors. The secured creditor benefits from a successful reorganization because its secured claim is valued on a going-concern basis in connection with a plan of reorganization, and the secured creditor is not compelled to liquidate its collateral at forced sale prices. However, when there is no reasonable likelihood that the objective of reorganization can be realized or when the debtor unreasonably delays, then the automatic stay and other statutory provisions designed to accomplish the reorganization objective become destructive of the legitimate rights and interests of creditors, the intended beneficiaries. In that situation it is incumbent upon the bankruptcy judge to effectuate the provisions of the Bankruptcy Code for the protection of creditors lest the judge keep the Code's word of promise to the ear of creditors and break it to their hope. The bankruptcy judge must meet head-on his obligation to decide, fairly and impartially, the hard questions.

Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and the goals of reorganizability on the one hand, and creditor protection on the other, are to be achieved ... [T]he bankruptcy court is an adjunct of the district court. District court judges function under Fed. R.Civ.P. 16 with full power and responsibility to manage their cases and with the directive to move their cases in such a

---

**53.** *Id.*, at 372, footnote 15. The court went on to refer to the House Report, and the following language in the House Report: "In most cases, 120 days will give the debtor adequate time to negotiate a settlement, without unduly delaying creditors. The court is given the power, though, to increase or reduce the 120-day period depending on the circumstances of the case."

**54.** How the bankruptcy court is to do this is not clear, in view of the policy of the Bankruptcy Code to keep judges out of the routine adminis-

tration of the case. Presumably this charge will be a duty of the United States Trustee.

**55.** Code § 1121 pertains to who may file a plan, and the timing for the filing of a plan, as well as the ability of parties in interest to request that the time for the filing of a plan be reduced or increased.

**56.** 808 F.2d at 372.

**57.** *Id.*

way as to promote fairness to the parties and judicial economy.[58]

Chief Judge Clark, in a concurring opinion, agreed that the mandatory construction of section 361 to require periodic cash payments representing lost opportunity was in error. Chief Judge Clark, however, stated, "... I do not agree that an award of such costs is always prohibited."[59] He then went on to give the bankruptcy court "a few straightforward directions."[60]

The dissenting opinion in general followed the approach of Professors Baird and Jackson.[61] Code section 361 was analyzed. Reference was made to *Butner v. United States.*[62] The analysis of the legislative history and the testimony before Congress differed with that of the majority.[63] The dissenting opinion stated, "Like the Ninth Circuit, I find that a proper reading of § 361 requires adequate protection of a secured creditor for the bankruptcy-created delay in enforcing his lien against collateral."[64] The dissent also pointed out the grim statistics of Chapter 11 cases.[65]

The dissent stated:

The objective candidate for a successful Chapter 11 reorganization is not hard to describe: it has some cash and a decent cash flow, encumbered or not; it has at least some lines of business that are profitable or nearly so; it has good management; and it is not facing a disas-trous economic forecast in all of its markets.[66]

*Timbers of Inwood* and *American Mariner* have one important concept in common—the need to balance the equities of the parties. *American Mariner* cautions against "overcompensating the secured creditor."[67] *Timbers of Inwood* urges interested persons to pay heed to the creditor protections enacted in the Bankruptcy Code.[68]

In attempting to follow *Timbers of Inwood,* in cases where there is no agreed financing or cash collateral order, which typically involve the most financially weak debtors, how does a court, or creditors, know in the early, critical days of a case, when undersecured creditors are seeking lost opportunity costs, if a debtor is viable, or if it has a reasonable possibility of reorganizing? In the early stages of a case, isn't the benefit of the doubt usually given to the debtor? Is a debtor to operate for some period of time almost entirely at the risk of creditors, unsecured and secured? Isn't bankruptcy a balancing of the rights and risks of all interested persons? Does that mean that creditors have few rights in the beginning of a case, but increasing rights as a case progresses? If that is the case, why isn't it so stated in the Bankruptcy Code? Will "a failure to recognize the secured creditors' rights in full ... *undercut* the bankruptcy goal of ensuring that assets are put to the use that best ad-

---

58. *Id.,* at 373–74.

59. *Id.,* at 374.

60. *Id.*

61. Apparently Professor Thomas H. Jackson also wrote an amicus curiae brief in this case, as well as in *American Mariner.* See 808 F.2d at 380. In this case his learned brief appeared to have had primary impact on the dissent, whereas in *American Mariner,* it had direct impact on the majority (without there being any dissent).

62. 808 F.2d at 376, 384.

63. *Id.,* at 376–78.

64. *Id.,* at 375.

65. "Over the last five years, the Administrative Office of the United States Courts reports that 90% of Chapter 11 cases nationwide failed to terminate within the provisions of Chapter 11. Of those in which plans are confirmed, the experienced bankruptcy practitioner knows that many plans call for liquidation of the debtor's assets. Thus, the concern that *American Mariner* adequate protection frustrates the 'reorganization policy' of bankruptcy law is irrelevant to the 90% of cases which ultimately liquidate. Compare *Jackson, Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Non-Bankruptcy Rules,* 60 Am.Bankr.L.J. 399, 416 (1986)." 808 F.2d at 382.

66. *Id.,* at 383.

67. 734 F.2d at 435, footnote 12.

68. 808 F.2d at 370–72.

vances everyone's interests?"[69] Isn't the secured creditor entitled to its benefit of the bargain, or to some relief enabling the creditor to approximate the benefit of its bargain? What about the Fifth Amendment? How long a period of time must pass before a secured creditor must receive adequate protection for its interests in property? These questions are not fully addressed by the court in *Timbers of Inwood.*

Blindly following either *American Mariner* or *Timbers of Inwood* presents a practical problem. Determination of the "value" of the collateral (using almost any definition of "value"[70]) is as much an art as a science, and honest, intelligent reasonable persons differ in opinions. In many cases whether a creditor is "fully secured but just barely so" or is undersecured depends on which appraisal the court is willing to accept in whole or in part, how soft collateral is valued and how the court analyzes external economic factors. When viewed in retrospect appraisals are rarely precisely correct.[71]

The problem is particularly acute because "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." Code section 506(a). The same property can have different values on different days when valued for different purposes.

If a creditor is oversecured, that creditor, pursuant to Code section 506(b),[72] receives

everything to which it is entitled, basically its entire "benefit of the bargain." That can be determined by "reconstructing the bargain." If a creditor is undersecured, the creditor is left to its resources, such as requesting lost opportunity costs, in order to avoid a possible economic disaster while the case is pending.

If the amount of the debt secured by a first mortgage on a parcel of real estate at the time of the filing of the petition initiating and at the time of a hearing pertaining to lost opportunity costs is $4,369,000, the ability of the lender to obtain "lost opportunity costs" applying *American Mariner* or *Timbers of Inwood* will depend on how the court values the real estate. As a practical matter, how can a court determine if a parcel of real estate is "valued" precisely at $4,340,000 or $4,375,000? The survival of a debtor or serious financial problems of a creditor should not depend on such a narrow determination.

If that were permitted, there would be substantially more uncertainty to the parties than would be the case if the court took a more flexible approach to the problems.

### Briggs (8th Circuit)

The issue, as stated in *Briggs,* is "... whether the concept of 'adequate protection' found in 11 U.S.C. §§ 361 and 362 (West Supp.1985) entitled undersecured creditors, as a matter of law, to interest payments from a debtor to compensate the creditors for lost opportunity costs due to

---

**69.** D. Baird and T. Jackson, *Cases, Problems and Materials on Bankruptcy 431* (1985).

**70.** The general word "value" "could mean—actual, appraised, assessed, book, break-up, carrying, real, replacement, depreciated face, fair, fair market, going-concern, insurable, intangible, intrinsic, liquidation, market, residual or sound and true." Jay Alix & Associates, *Accounting & Finance for Judges* 12 (1986).

**71.** Judge Richard A. Posner, in *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986) referred to "... the old problem of expert witnesses who are 'often the mere paid advocates or partisans of those who employ and pay them, as much so

as the attorneys who conduct the suit. There is hardly anything, not palpably absurd on its face, that cannot now be proved by some so-called 'experts.' ... The expert in this case dazzled the jury with 'an array of figures conveying a delusive impression of exactness' ...'"

**72.** Code § 506(b) provides:
(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

the delay in reinvesting the collateral's liquidated value caused by an automatic stay."[73] The court in *Briggs* held, "... such interest payments are permissible but not required to provide adequate protection ..."[74]

The secured creditor relied upon the Fifth Amendment and on *Louisville Joint Stock Land Bank v. Radford,* supra [hereinafter *Radford* ]. The Eight Circuit Court of Appeals distinguished *Radford,* which held the Bankruptcy Act of 1934 unconstitutional, since it, in the context of farm mortgages, "essentially 'compelled the mortgagee to relinquish the property to the mortgagor free of the lien,' *Radford,* 295 U.S. at 599, 55 S.Ct. at 867, thus *permanently* transforming the parties' rights regarding the property."[75] (emphasis added).

The court in *Briggs* continued:

The bankruptcy code's automatic stay, however, causes only a temporary delay of a creditor's right to enforce its lien on the collateral. In *Continental Illinois National Bank & Trust v. Chicago, Rock Island & Pacific Railway Co.,* 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935), the Supreme Court held that suspension of the right to enforce a lien is within Congress's constitutional bankruptcy powers. *See Continental Illinois,* 294 U.S. at 675, 55 S.Ct. at 605. Section 362(a)'s temporary stay is thus not a taking of the creditors' substantive rights in specific property acquired before the petition's filing as was true in *Radford.* See *Radford,* 295 U.S. at 590, 55 S.Ct. at 863.... In a constitutional

sense, this temporary suspension of lien enforcement breaches no essential property interest of the creditor and is not an unlawful taking under the Fifth Amendment.[76]

The court quoted *Bank of Marin v. England:* "Bankruptcy courts do not read statutory words with a computer's ease, but operate under the overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction."[77] The Court also stated the maxim that "a bankruptcy court is a court of equity."[78] The fundamental purposes of Chapter 11 business reorganizations stated in *American Mariner* were set forth,[79] as was the philosophy of bankruptcy espoused so cogently by Professors Baird and Jackson:[80] "The stay also shields creditors from each other and is intended to aid in equitably distributing the debtor's assets in a way that maximizes the interests of all parties."[81]

The court in *Briggs* also looked to the legislative history. The court quoted *American Mariner* and the House Report which stated, "There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws."[82] The court continued, "... creditors have no right to be placed in the same economic position as if there had been no bankruptcy filing."[83] ... "Bankruptcy involves a balancing of interests between the debtor and creditors."[84] The court then stated its basic ruling:

This court is convinced that the most reasonable approach accommodating the

---

**73.** 780 F.2d at 1340.

**74.** *Id.*

**75.** *Id.,* at 1342.

**76.** *Id.*

**77.** *Id.,* at 1343; *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

**78.** 780 F.2d at 1343.

**79.** *Id.,* at 1343.

**80.** Compare this statement with, "... a bankruptcy proceeding exists in large part to cure

the collective action problems that might arise if each individual creditor pursues its own self-interest." D. Baird and T. Jackson, *Teacher's Manual Cases, Problems and Materials on Bankruptcy* vii.

**81.** 780 F.2d at 1343.

**82.** *Id.,* at 1345; *American Mariner,* 734 F.2d at 431 (quoting H.Rep. No. 95–595 at 339, 1978 U.S.Code Cong. & Ad.News at 5787, 6295).

**83.** *Id.,* at 1346–47.

**84.** *Id.*

greatest number of interests is to refrain from shaping a rigid rule that compensation for post-petition interest either must or cannot be required as a component of adequate protection in the context of an automatic stay.[85]

The court reiterated the purposes of business reorganization under Chapter 11 —"to initially relieve the debtor of its pre-petition debts, to free cash flow to meet current operating expenses, and ultimately to permit the debtor 'to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders',"[86] all of which were stated in *American Mariner*.[87]

*Briggs* continued, "Flexibility was legislated into the Bankruptcy Code by the very fact that the term "adequate protection" resists precise definition."[88] "What constitutes the bargain whose benefit should be protected on the creditor's behalf turns on factors which reveal the parties' reasonable expectations. This may include, but is not limited to, the quality of the collateral or the length of the stay." Other factors to take into consideration include "whether the collateral's lien value is demonstrated to be appreciating, depreciating or remaining relatively stable, ... [and] whether taxes and other payments designed to keep the collateral free of statutory liens are being paid or will be paid by a debtor ..."[89]

The court in *Briggs* went on to say:

... while protection of lost opportunity costs for going concern values may not be required in cases with a high chance of success, liquidation values, including lost opportunity costs, might be deemed protectable where the chance of reorganization is slight.[90]

The court concluded by stating:

We agree with the Ninth Circuit that the policies behind sections 361 and 362 permit maximum flexibility in structuring a debtor's proposal for adequate protection. See *American Mariner*, 734 F.2d at 435.[91]

\* \* \* \* \* \*

Although the concept of adequate protection under sections 361 and 362 requires the court to protect the creditor's allowed secured claim by compensating for any loss of value of the collateral, what constitutes adequate protection in a particular case is a question whose resolution is best left to the knowledge and expertise of the bankruptcy court.[92]

The dissenting opinion stated that "the preferable course is that set down by the Ninth Circuit in *American Mariner Industries*. This approach gives more certainty to the function of the bankruptcy court, and is more consistent with congressional intent."[93]

Strictly following *Briggs* results in too much uncertainty to the parties. The decision of the Court as to whether or not "the chance of reorganization is slight" may require a valuation of assets based upon liquidation values. That would be tantamount to a decision whether the case will continue or whether the Debtor will be forced to convert to Chapter 7. Under those circumstances, following *Briggs* would probably require that lost opportunity costs be deemed protectable.[94]

## GENERAL GUIDANCE FROM THE SEVENTH CIRCUIT COURT OF APPEALS

Although the Seventh Circuit Court of Appeals has not yet ruled on matters pertaining to lost opportunity costs, it has

---

85. *Id.,* at 1348.

86. *Id.*

87. 734 F.2d at 431.

88. 780 F.2d at 1348.

89. *Id.,* at 1349.

90. *Id.*

91. *Id.,* at 1350.

92. *Id.,* at 1351.

93. *Id.*

94. *Id.,* at 1349.

given bankruptcy courts firm guidance in the interpretation of statutes.

In *Matter of Armstrong* 812 F.2d. 1024, 1026 (7th Cir.1987), the court referred to "the broad interpretation to be given to the bankruptcy code in general."

*In the Matter of McVey Trucking, Inc.,* 812 F.2d 311 (7th Cir.1987) gave guidance in statutory construction.

Normally, in interpreting a statute, we look to the face of the statute and to the accompanying legislative history. We then determine, in light of this evidence, what we believe Congress intended. *Id.,* at 323.

"... it is incumbent upon the federal courts to be *certain* of Congress' intent." *Atascadero State Hospital v. Scanlon,* [473 U.S. 234] 105 S.Ct. [3142] at 3148 [87 L.Ed.2d 171] (emphasis added). *Id.,* at 324.

"... we must remember that our goal here, as in any effort at statutory interpretation, is "to construe the language [of the statute] so as to give effect to the intention of Congress. *United States v. American Trucking,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940)." *Id.,* at 325.

"... in seeking to construe a statute, we do not view any provision in isolation. Rather, we seek to understand a given provision by determining how it fits into the larger statute of which it is a part. See, e.g. *Water Quality Ass'n v. United States,* 795 F.2d 1303, 1306–08 (7th Cir. 1986). The Supreme Court has only recently reminded us of the importance of taking such an integrated view when interpreting the Bankruptcy Code. *See Kelly v. Robinson,* —— U.S. ——, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986)." *Id.,* at 326.

Congress has suggested flexibility. In reference to Code section 361, Committee Notes state:

The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop hard and fast rules that will apply in every case ... The time and method of valuation is not specified precisely, in order to avoid that result. There are an infinite number of variations possible in dealings between debtors and creditors, the law is continually developing, and new ideas are continually being implemented in this field. The flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.[95]

The Supreme Court has also taken a broad view when dealing with the interpretation of bankruptcy statutes.[96]

## APPLICATION OF THE RULES

Adequate protection, in the final analysis, is determined by the Fifth Amendment. As Mr. Justice Brandeis pointed out, "The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."[97] That that remains basic law was confirmed in a 1982 Supreme Court decision: "The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation. *Louisville Joint Stock Land Bank v. Radford.*"[98,99]

Courts recognize that "a secured creditor's interest in its collateral is a substantive property right created by nonbankrupt-

---

**95.** Notes of Committee on the Judiciary, H.Rep. No. 95–595 at 338–40, 1978 U.S.Code Cong. & Admin.News at 6295.

**96.** See, e.g., *Bank of Marin v. England,* supra.

**97.** *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 589, 55 S.Ct. 854, 863, 79 L.Ed. 1593 (1935).

**98.** *Id.; United States v. Security Industrial Bank,* 459 U.S. 70, 75, 103 S.Ct. 407, 409, 74 L.Ed. 235 (1982) (Rehnquist, J.). This case dealt with Code § 522(f).

**99.** This Decision will not address substantive due process requirements of secured creditors resulting from their rights in property of a debtor. Cf. *In re Blumer,* 66 B.R. 109, 15 BCD 244, 246–47 (Bankr. 9th Cir.1986).

cy law which may not be substantially impaired when bankruptcy intervenes." [100] "Though the creditor might not receive his bargain in kind, the purpose of the section [361] is to insure that the secured creditor receives in value essentially what he bargained for." [101]

The Code does not mandate a specific form of adequate protection. The Historical and Revision Notes do not indicate that a specific form of adequate protection is or is not required. This Court believes that it is inappropriate to mandate or to refuse to grant a specific form of adequate protection in all cases, whether or not the mandated adequate protection is appropriate in the case.

Learned persons have written in articles that the denial of lost opportunity costs in all cases would result in more certainty in the bankruptcy process. They have also argued that the granting of lost opportunity costs in some, but not all cases, would result in the almost automatic filing of a motion for lost opportunity costs by every undersecured creditor in an already overburdened bankruptcy court system.

This Court rejects those arguments. Although those arguments raise valid points, they are insufficient reasons to deny a person its rights.

### METHOD OF DETERMINATION

The Court must begin by determining what the bargain was between the creditor and the debtor. As a general rule, a debtor has the right to restore a creditor to the bargain. Ordinarily that bargain does not include granting the creditor lost opportunity costs in the event a debtor files a petition in bankruptcy.

■ In the cases when the bargain includes the granting of lost opportunity costs, it is necessary to determine if there was reasonable reliance by the creditor on the contractual provisions permitting lost opportunity costs. If there was no reasonable reliance, lost opportunity costs are not compensable.[102] Due consideration must also be given as to whether or not the Court will be able to unravel lost opportunity costs in the event they are granted and the Debtor is successful in confirming a plan.

When lost opportunity costs are granted, they must be considered as an element of adequate protection, not as a separate and additional benefit.

■ The Court must determine what interests in property are being adversely affected. The nature of the collateral must be analyzed.

The Court must estimate the period of time during which the interests of parties in the property will be adversely affected. A short time factor may not result in a "taking" under the circumstances of the case, and lost opportunity costs need not be granted.

■ There must be a high positive correlation between the prepetition agreement and the anticipated financial result of the adequate protection provided by the Court.

■ Economic matters must be taken into account, such as the apparent viability of the debtor and its management. The age of the case and its development may be significant factors.

■ The Court ultimately must balance the needs of the creditor against the needs of the debtor. The Court must also balance the ability of the debtor to comply with the proposed court order against the financial ramifications on the creditor. A resultant bankruptcy of the creditor would be one bankruptcy too many. The Court can then determine what adequate protection is necessary and appropriate and for

---

**100.** *In re American Resources Management Corp.,* 51 B.R. 713, 719 (Bankr.D.Utah, 1985). That is in accord with *Butner v. United States,* supra, and *Radford,* supra.

**101.** H.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad.News at 6295, quoted in *In re American Mariner,* supra, at 431.

**102.** *In re Manville Forest Products Corp.,* 43 B.R. 293, 301–03 (Bankr.S.D.N.Y., Lifland, C.J., 1984).

what period of time. Lost opportunity costs then come into play as a permissible element of adequate protection provided that they were part of the bargain.[103]

 Procedurally, the Court will hold a preliminary hearing. The Decision, due to time constraints, may be based in part upon estimates and a lower standard of proof than might otherwise be required. The decision would be the law of the case until and unless a person requests a final hearing. At a final hearing, if held, the parties will be required to support fully all allegations, claims and values. When these guidelines and procedures are followed, Fifth Amendment requirements and the economic and practical needs of the parties will be met without a windfall or economic chaos to any person.

## RESOLUTION

All matters presently before the Court are core proceedings.

The Debtor has an interest in the funds in the Bank subject to the levy of the IRS. All funds in the three bank accounts shall be turned over to the Debtor.[104]

The IRS is entitled to adequate protection pending a final determination of the rights of the IRS.

The Debtor may not at this time set off the amount of the claimed tax refund against the funds subject to the levy. The IRS shall proceed promptly to determine if it believes that a refund must be given, and the Debtor shall be notified promptly after the decision is made.

As between the IRS and the Bank, the Bank has a prior and perfected security interest in and lien upon the funds in the

Bank at the time of the levy. The Bank need not pay those sums to the IRS and sue for a refund, nor need the Bank pay those sums to the Clerk of District Court and commence an action for declaratory relief.[105]

The funds subject to the levy can be used by the Debtor in the normal course of its business. The Debtor may use the cash collateral of the Bank and the IRS subject strictly to the terms of this Decision.

The demand of the IRS that the Bank marshal its assets will be considered by this Court if and when a hearing is requested by the IRS. No hearing is requested at this time. It will be deemed withdrawn if no request is made for a hearing prior to the time a plan in this case is confirmed.

The IRS is entitled to adequate protection to the extent of its interest in the property of the Debtor ($20,820.14, the amount in the Bank at the time of its levy).

The IRS shall have, and is hereby given, a first and paramount security interest in and lien upon the nine operating school buses which are presently free and clear of all security interests and liens. The IRS shall not have a first lien upon ten school buses which are out of service and are being used for parts. The legal complexities which would arise by a tracing of those parts into other collateral do not warrant the granting of a lien on those non-operating buses to the IRS.

The Bank is not granted a security interest in the ten nonoperating buses for the same reason. In the event any of those ten buses is put in service through the use of parts in which no other creditor has a security interest, the IRS shall have a perfected first lien on any such bus(es).

---

**103.** For a detailed analysis of the application of basic principles, see Frances Gecker, *Comment—The Recovery of Opportunity Costs as Just Compensation: A Takings Analysis of Adequate Protection,* currently under final revision for publication in —— Nw.U.L.Rev. —— (1987). This perceptive article contains a model, and the application of the model to *American Mariner, Briggs* and *Timbers of Inwood.* The use, development and refinement of a model can be helpful, and it can serve as a general guide in most cases.

**104.** Although the IRS is entitled to the $118.93 in the Payroll Account, for purposes of practicality, the IRS agreed to permit that sum to be returned to the debtor, to be used for payroll. It was agreed that no precedent would be established by the IRS.

**105.** The IRS consented to this procedure under the unique circumstances of this case, upon the understanding that this procedure shall not be a precedent nor be cited in other proceedings. The Court approved that understanding.

The IRS is also granted a second and subsequent security interest in and lien upon all corporate assets in which the Bank or other secured creditor has a perfected first security interest. If there is more than one outstanding perfected security interest or lien upon any such assets, the IRS shall be subsequent to all existing and perfected liens and security interests. The property subject to the lien of the IRS shall include, without limitation, accounts, general intangibles, the ten school buses upon which Elkhorn School Bus Co. has a prior and paramount lien and security interest, and all partnership interests of the Debtor.

The Debtor shall execute and deliver to the IRS and to the Bank all security agreements, financing statements and other documents necessary for the IRS and/or for the Bank to have written evidence of its security interests and liens, and to enable the IRS and/or the Bank to perfect properly its interests pursuant to law. The Debtor, the Bank and the IRS shall use current Wisconsin Bankers Association forms for the security agreements and other documents executed pursuant to or by virtue of this Decision.

The adversary proceeding pertaining to the turnover of funds subject to the levy is now moot. If any party desires to pursue that matter, the Court shall be so advised promptly. Otherwise the debtor shall move to dismiss that adversary proceeding within 45 days of the date of this Decision.

As adequate protection for the Bank, in addition to the security interests referred to above, the Bank shall receive monthly payments in the sum of $3051.28, on the same day of each month as the day the prepetition loan payments were to be made. The amount of this payment is the same as the prepetition payment.

The Bank shall also have a post-petition security interest in and lien upon the same class and type of assets as the Bank had a security interest and lien upon prior to the commencement of this case. The Bank shall also retain all of its prepetition security interests and liens on all prepetition collateral to the extent that collateral remains the property of the Debtor.

The Bank shall receive a replacement security interest and lien on all of its prepetition collateral disposed of by the Debtor. The collateral pool of the Bank shall not decrease in value. The Bank shall not improve its position by picking up any new collateral of a type or class upon which it did not have a prepetition security interest or lien.

The Bank is neither expected, nor obligated, to lend any additional funds. The indebtedness due and owing to the Bank shall be secured both by its prepetition and its post-petition collateral. There shall be complete cross-collateralization. All debt shall be secured by the entire prepetition and post-petition collateral pool, and the entire collateral pool shall secure all prepetition and post-petition indebtedness.

The Bank, the IRS and the counsel for the Committee of Unsecured Creditors shall receive all reasonably requested financial information from the Debtor within the time reasonably requested. The financial information shall include, without limitation, bi-weekly cash flow reports showing receipts, disbursements and changes from the previous report. The bi-weekly information shall be received within five days of the end of each bi-weekly period. The same persons shall also receive monthly financial statements, including, without limitation, income statements, balance sheets and profit and loss statements, all within seventeen calendar days of the end of each month. When the United States Trustee enters this case, the United States Trustee shall receive identical financial information.

Thresholds on values of collateral shall be established by mutual agreement. If that is not possible, the Court shall be notified, and the Court, following a hearing, will establish the threshold values. The IRS shall be kept advised of the pertinent values, so that it can continue to monitor intelligently its collateral position.

All buses shall be well maintained, and they shall be safe at all times.

All of the collateral of the IRS and the Bank shall be kept fully insured at all

times, with the policies of insurance showing the interests of the IRS and the Bank. The IRS and the Bank shall be furnished with certificates of insurance and other evidence of insurance of all of their interests, with appropriate loss payable provisions. That shall be done promptly.

The Debtor may operate only in the ordinary course of its business. There shall be no increases in salary to any corporate employee without further court order. There shall be no corporate loan to any person. The $20,820.00 replacement lien on accounts previously granted to the IRS at the January 29, 1987, hearing shall be, and is, further replaced by all of the adequate protection granted in this Decision.

The Order pursuant to the hearing on January 29, 1987, shall remain in effect through and including May 1, 1987, at 4:00 p.m., except to the extent that it is modified in this Decision.

Charles B. Monfre shall not receive any compensation from the Debtor without further court order. If Charles B. Monfre again becomes an active employee of the Debtor, the Court will reconsider this provision. The funds which otherwise would have been used to pay his $60,000 annual salary are needed by the Debtor for working capital, and the availability of those funds to the Debtor make the positions of the IRS and the Bank more secure.

Key person life insurance shall be reduced to the level which existed prior to the major increases shortly before the commencement of this case. That shall be done no later than the expiration of thirty days from February 2, 1987. The parties are permitted, but not obligated, to discuss this item further, and to make a joint recommendation to the Court, in the event they believe that it is not in the best economic interests of the Debtor to reduce the

amount of insurance due to the possible loss of cash values.[106]

The Debtor shall file a disclosure statement and a proposed plan on or before May 1, 1987, at 4:00 p.m. A rule of reason shall apply as to all matters pertaining to this Decision. The adequate protection granted in this Decision, and the accompanying agreement of the parties, shall expire on May 1, 1987, at 4:00 p.m.

Prior to May 1, 1987, the IRS, the Bank and the Debtor shall request further or other relief pertaining to adequate protection.

All of the foregoing shall constitute adequate protection to the IRS and to the Bank. Since the Bank is substantially oversecured, it is not awarded lost opportunity costs at this time. The granting of lost opportunity costs to the IRS is not warranted under the circumstances of this case. To do so would be to disregard the guidelines and principles previously stated.

The motion of the Bank to shorten the time for the Debtor to file a disclosure statement and a plan shall be deemed withdrawn without prejudice, as requested by the Bank.

The parties may draft an Agreement in accordance with this Decision and accompanying Order.

All provisions of this Decision and accompanying Order shall be effective as of the conclusion of the hearing on February 2, 1987.[107]

This Decision constitutes Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

An Order consistent with this Decision shall be entered.

---

**106.** Reference to the possible loss of cash value was made at the February 2, 1987, trial. Specific information was not available. The IRS and the Bank requested the right to reconsider their request that the amount of term insurance be rolled back until they had an opportunity to inspect the policies of insurance.

**107.** This Court is cognizant of the "anti-lessons that our heavily student-influenced legal culture enforces," such as, "7. Use long textual footnotes to make your work hard to follow, and to avoid having to integrate your ideas in a logical structure." Posner, *Essay Goodbye to the Bluebook*, 53 U.Chi.L.Rev. No. 4, 1343, 1350 (Fall 1986). Because of the desire of the parties for a thorough decision of all issues for appeal purposes, the extensive use of footnotes was necessary, contrary to standard practice of this Court.