BANKWEST, N.A., Pierre, South
Dakota, Appellant,

v.

Anton J. TODD and Grace Todd, d/b/a
Farmers and Ranchers, Appellees.

Bankruptcy No. 85–3008.

United States District Court,
D. South Dakota, C.D.

May 30, 1985.

James Carlon, Pierre, S.D., for debt-
ors/appellees.

Patricia A. Meyers, Pierre, S.D., for cred-
itor/appellant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

This is an appeal from a cash collateral
order entered by the bankruptcy court on
January 29, 1985. Appellant BankWest
(Bank) argues that its interest in the grain
and livestock that debtors intend to convert
into cash collateral is not adequately pro-
tected within the meaning of the Bankrupt-
cy Code. 11 U.S.C. § 361.

## FACTUAL SUMMARY

Debtors, lifelong farmers and ranchers
in Sully County, South Dakota, filed their
voluntary Chapter 11 petition on December
21, 1984. Ten days later, on December 31,
1984, debtors moved for use of cash collat-
eral.[1] In their cash collateral motion, debt-
ors proposed they be permitted to sell an

---

1. 11 U.S.C. § 363(b)(1) provides that a bank-
ruptcy "trustee, after notice and a hearing, may
use, sell, or lease, other than in the ordinary
course of business, property of the estate." Sec-
tion 363(e), which is intended to serve as a
limitation on the debtor's use of cash collateral
provides:

Notwithstanding any other provision of this
section, at any time, on request of an entity
that has an interest in property used, sold, or
leased, or proposed to be used, sold, or leased,
by the trustee, the court, with or without a
hearing, shall prohibit or condition such use,
sale, or lease as is necessary to provide ade-
quate protection of such interest.

estimated $22,850 worth of cattle, corn, oats and sunflowers in which Bank claimed a security interest in order to meet part of their operating expenses for the period January through July, 1985.

On January 8, 1985, the bankruptcy court conducted an expedited preliminary hearing for the purpose of considering debtors' cash collateral motion.[2] Consistent with local practice rules promulgated by the bankruptcy court, debtors submitted four exhibits in written summary form showing, *inter alia*, the proposed source of cash collateral to be used; the proposed source of adequate protection; and debtors' budget projections for the period contemplated by their cash collateral motion.[3] According to debtor Anton Todd, the four exhibits were prepared by himself and a consulting accountant.

The debtors' exhibits, all of which were eventually received in evidence by the bankruptcy court, calculate that debtors' operating expenses between January and July, 1985 will be $56,945. The exhibits further indicate that debtors can meet part of their expenses by selling $22,850 of livestock and crops secured to Bank. As adequate protection, debtors offered Bank a replacement lien in nineteen calves they expected would be born in March or April, 1985, and in a variety of their 1985 crops.

On direct examination, Anton Todd testified that the debtors' forecasts for their 1985 crop yields were based on ASCS figures for debtors' farm and farms in their community. Debtors did not, however, offer any documentary evidence corroborating this testimony. Additionally, debtors did not offer any explanation as to how debtors valued the livestock component of their replacement lien or how they valued the property they proposed to sell pursuant to the cash collateral order.

At the close of the January 8, 1985 preliminary hearing, the bankruptcy court orally granted debtors' cash collateral motion. On January 29, 1985, the bankruptcy court entered its formal findings of fact and conclusions of law, and its written order. The bankruptcy court concluded that the value of Bank's interest in the collateral to be sold pursuant to its order was $22,850. The court further concluded that this sum would be adequately protected by a replacement lien covering nineteen calves; 220 acres of wheat that Anton Todd testified had been planted but not harvested at the time of the expedited preliminary hearing; and ten additional cows debtors proposed they be permitted to buy with the proceeds from the sale of existing collateral secured to Bank. The bankruptcy court apparently believed that this replacement lien allowed Bank "to realize the value of its bargain with Debtors."

The bankruptcy court further ordered debtors to (1) provide Bank with regular financial reports and annotated bank statements; (2) keep Bank apprised of the disposition of assets and allow Bank's representatives to inventory and inspect collateral on a monthly basis; (3) operate their business so as to stay within a specified budget; (4) deposit cash received from the sale of secured collateral in excess of cash required for immediate expenses in an interest-bear-

---

2. As an alternative to a full hearing on a cash collateral motion, 11 U.S.C. § 363(c)(3) provides for a preliminary hearing, scheduled "in accordance with the needs of the debtor." At a preliminary hearing, a court may authorize the use of cash collateral "only if there is a reasonable likelihood that the trustee [or debtors-in-possession] will prevail at the final hearing...." *Id.*

3. Addendum No. 2 to the bankruptcy court's "General Order in Bankruptcy, August 1, 1983" (the local rules), filed April 11, 1985, provides in pertinent part:

In reference to hearing for use of cash collateral; prior to obtaining a date for hearing counsel must have attached to the motion for use of cash collateral:

a. written temporary budget, including a reasonably detailed itemization of debtor(s) income and expenses for the period requested for use of cash collateral;

b. written proposal of the source of cash collateral to be used;

c. written proposal of adequate protection; each in a form of a summary and marked as an exhibit, and also to be served on all parties in interest in accordance with Paragraph 2, supra, and pursuant to Rule # 11 of General Order dated and filed on August 1, 1983.

ing account; and (5) provide Bank with a lien on both the debtor-in-possession account and interest-bearing account. Finally, the bankruptcy court ordered that its cash collateral order remain effective until April, 1985, at which time the court intended to reconsider its decision.

## DISCUSSION

### I.

The facts of the instant case are strikingly similar to the facts of a recent Eighth Circuit Court of Appeals decision, *In re Martin*, 761 F.2d 472 (8th Cir.1985). In *Martin*, a consolidated appeal from the Federal District Court of North Dakota, several farmers in Chapter 11 bankruptcy proposed they be allowed to convert grain stored under loan to the Commodity Credit Corporation into cash collateral in exchange for a lien on nonexistent crops and an assignment of federal crop insurance. In an extensive opinion, the Eighth Circuit set out the standards to be used in making cash collateral determinations. According to the court,

> [i]n any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest; (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral; and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*Id.* at 476.

### A. VALUE.

In *First Bank of Miller v. Wieseler*, 45 B.R. 871 (D.C.D.S.D.1985), this court stressed the importance of establishing the value of the secured creditor's interest before permitting the debtor to convert existing secured property into cash collateral. Noting that when a debtor prevails on a cash collateral motion the creditor's existing, bargained-for collateral is used up, this court stated that "[w]ith so much at stake for the creditor, it seems incumbent on the

bankruptcy court to make a specific value determination...." *Id.* at 875. In *Martin*, the Eighth Circuit indicated that proof of value would require more substantial evidence than merely a debtor's personal estimates. *Martin, supra* at 477.

In the case at hand, debtors presented no documentary evidence in support of the values they assigned to the property secured to Bank. Indeed, it appears from the record in this case that the figures contained on debtors' four exhibits are nothing other than debtors' predictions. As this court stated in *Wieseler*, to provide adequate protection, debtors "must go beyond simply estimating what they hope they can harvest and what they hope the market will bring for it." *Wieseler, supra* at 876.

### B. RISKS.

In assessing the risks associated with an adequate protection plan which proposes a replacement lien in not yet existent crops, the *Martin* court suggested a bankruptcy court consider the following:

> the anticipated yield in light of the productivity of the land; the husbandry practices of the farmer, including his proven crop yields from previous years; the health and reliability of the farmer; the condition of the farmer's machinery; whether there are encumbrances on the machinery which may subject it to being repossessed before the crop is harvested; the potential encumbrances on the present or future crop by other secured creditors; the availability of crop insurance and the risk of crop failure not covered by the crop insurance; and the anticipated fluctuation in market price of the farmer's crop.

*Id.* at 477.

Similarly, in *Wieseler*, this court expressed a concern that the debtors' offer to exercise good farming practices was not, in light of the numerous risks inherent in the agriculture business, an adequate substitute to crop insurance. *Wieseler, supra* at 877. This court further observed that where a farm is not irrigated, the need for

insurance is even more acute. *Id.* (citing *In re Sheehan,* 38 B.R. 859, 866 (Bkrptcy. D.S.D.1984).

From the record in the instant case, it plainly appears that the potential risks to Bank's interest in the property subject to the cash collateral order was not sufficiently addressed in the bankruptcy court. No inquiry was made regarding the debtors' reliability and physical condition, the condition of their farm machinery, the title status of their machinery, or debtors' farming practices. Nor was there evidence offered substantiating debtors' projected crop yields and market price forecasts.

Moreover, just as in the *Wieseler* case, debtors' adequate protection plan contemplates their personal assurance to exercise good farming practices rather than crop insurance. In *Martin,* the Eighth Circuit directed the bankruptcy court on remand to evaluate the risks to the creditor's security caused by crop failures not covered by an insurance policy. *Martin, supra* at 477. In this case, debtors have not even offered crop insurance. Moreover, debtors do not irrigate, thereby making their anticipated 1985 harvest even more susceptible to uncertain weather conditions.

In the instant case, debtors proposed that they be permitted to use cash collateral from January to July, 1985. This period amounts to debtors' entire planting season. Debtors proposed their cash collateral plan only ten days after filing their Chapter 11 petition. It is the opinion of this court, that the risks associated with cash collateral proposals such as the one at issue in this case could be greatly reduced by requesting only a minimum amount of cash collateral at the outset of a bankruptcy. It has been suggested that "[a]t the beginning of bankruptcy [generally, the first thirty days[4]], a debtor should be allowed to use cash collateral without a full hearing only if he needs the funds to pay immediately due expenses in the ordinary course of his business." Note, *Standards*

*and Sanctions for the Use of Cash Collateral Under the Bankruptcy Code,* 63 Tex. L.Rev. 341, 354 (1984).

By Section 363, the Bankruptcy Code permits debtors to use, sell or lease property in which a creditor has an interest. In many cases, the Chapter 11 or 13 debtor's survival between petition and confirmation of a plan may depend on debtor's ability to use the cash collateral to defray current expenses. However, this court believes that the cash collateral provisions are abused where they are employed to force a creditor to finance a bankrupt business for lengthy periods of time without the benefit of a full and final hearing and without a filed plan and disclosure statement available for review.

■ During the initial stages of a bankruptcy, cash collateral orders should be confined to meet emergency expenses. By keeping the debtors on a shorter tether, the risks associated with the use of cash collateral are reduced because the amount of money at stake is reduced. Additionally, debtors are encouraged to file their reorganization plans. Underscoring the importance of expeditiously filing a plan in a farm bankruptcy such as the instant case is the Eighth Circuit's decision *In Re Button Hook Cattle Co.,* 747 F.2d 483 (8th Cir. 1984). In *Button Hook,* the court held pursuant to 11 U.S.C. § 1123(b)(4) that a farmer who files a Chapter 11 petition but fails to submit a reorganization plan within 120 days from filing is vulnerable to a liquidation plan filed by a party in interest, and, in such a situation, a bankruptcy court may confirm the liquidation plan over the farmer's objection.

Only at a later stage of the bankruptcy, after the debtors have filed a plan, should a larger scale cash collateral order be contemplated. With information pertaining to the prospects of debtors' successfully reorganizing, the court can better assess the risks encompassed in a debtor's adequate protection proposal. If debtors are unable

---

4. Consistent with the flexibility written into the Bankruptcy Code's cash collateral provisions, the commentator suggests that the courts be flexible in deciding what constitutes the beginning of a bankruptcy. Note, *supra* at 354 n. 90.

to show a reasonable likelihood of their ultimate success, there may be no basis for permitting a cash collateral order. On the other hand, a showing of high potential for ultimate success of a reorganization is one of the best indications that a creditor is adequately protected.

This court notes that in the instant case, the bankruptcy court ordered that its cash collateral ruling would be reconsidered in April. While under the circumstances of this case the shorter period ordered by the bankruptcy court seems preferable to the six month period proposed by debtors, the key is that non-emergency expenses be paid by cash collateral only after a plan is filed and a debtor's prospects for successfully reorganizing can be evaluated.

## C. INDUBITABLE EQUIVALENT.

In setting forth the guidelines for cash collateral determinations, the *Martin* court found the inclusion of the phrase "indubitable equivalent" in 11 U.S.C. § 361(3) particularly significant. After examining the legislative history of Section 361, the Eighth Circuit concluded that the phrase was included in Section 361 to assure that in structuring an adequate protection proposal, the debtor " 'should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights.' " *Id.* at 476 (quoting *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir.1984)). Thus, "after considering the value of the secured creditor's interest and the risks associated with the debtor's proposal, the bankruptcy court must ultimately decide whether the debtor's adequate protection proposal provides protection to the creditor consistent with the concept of indubitable equivalence." *Martin, supra* at 477.

It is the opinion of this court that Bank in this case has not been sufficiently assured of the indubitable equivalence of its existing security. The bankruptcy court neither properly valued the Bank's interest nor correctly assessed the risks connected to debtor's cash collateral proposal. Its conclusion that the proffered replacement

lien allows Bank to realize the "value of its bargain" does not withstand scrutiny. Ordinarily, therefore, this court would be inclined to remand this case for in-depth reconsideration consistent with *Wieseler* and the Eighth Circuit's *Martin* opinion. However, because of circumstances noted hereafter, this court must affirm.

## II.

█ Appellant Bank filed its motion for leave to appeal in this case on February 20, 1985. On the same date, this court entered an order granting appellant's motion and a second order instructing counsel to appear before the court on February 25, 1985 for purposes of a hearing. Following this hearing, the court ordered counsel for Bank to submit its objections to the cash collateral order in written form, and counsel for debtors to submit a response. The court then ordered the parties to submit simultaneous briefs by April 15, 1985.

Throughout this appellate process, debtors were, pursuant to the bankruptcy court's order, spending cash collateral. From the record in this case, it appears debtors have already spent a significant amount, if not all, of the cash collateral obtained by selling Bank's secured property. At no time, however, did Bank move this court for a stay. Accordingly, the cash collateral issue in this case is moot to the extent of the amounts already expended by debtors. *See Dahlquist v. First Nat'l Bank*, 737 F.2d 733 (8th Cir.1984).

With respect to whatever amount of cash collateral is still unexpended, if any, this court believes it would be both economically unwise and inequitable to reverse and remand at this time. The record in this case discloses that by this point in debtors' bankruptcy, they have already purchased, if not planted, all the seeds and plants necessary for the 1985 crops. Further, the livestock debtors allocated to the replacement lien are already born or have been purchased. To stop the flow of capital now would be potentially far more ruinous to the debtors' business and their prospects of

ultimate success than such an action would have been on the date Bank appealed.[5]

### CONCLUSION

 If this court's *Wieseler* opinion left any doubt that minimal compliance with the local bankruptcy practice rules would not be sufficient to obtain a cash collateral order under Section 363, the Eighth Circuit's *Martin* decision should remove any question. While the question of whether adequate protection exists in a particular case depends upon the nature of the collateral and the nature of the debtor's proposed use of that collateral, it is plainly not enough in any case for a debtor to merely make predictions, write them down, and offer them as exhibits showing adequate protection. Having examined the record in this case, this court concludes that the bankruptcy court's decision conflicts with both the *Wieseler* and *Martin* opinions. However, for the reasons previously set out, this court must affirm.

---

**5.** Because this court does not reverse and remand this case for the reasons stated above, this court finds it unnecessary to address Bank's argument to the effect that the nineteen calves subject to the replacement lien are not adequate protection because they were conceived by debtors' cows prior to the date debtors filed their petition, and were therefore covered by Bank's initial, pre-bankruptcy secured claim. *See* 11 U.S.C. § 552(b).