In re CANN & SAUL STEEL COMPA-
NY also d/b/a Alburtis Steel
Company, Debtor.

Bankruptcy No. 87–01153S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 5, 1987.

As Amended Aug. 11, 1987.

Lawrence J. Tabas, Philadelphia, Pa., for debtor.

Alan C. Gershenson, Earl T. Stamm, Regina Stango Kelbon, Philadelphia, Pa., for Continental Bank.

Robert Bernstein, Pittsburgh, Pa., for Creditors' Committee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant Chapter 11 bankruptcy case brings before us a smaller version of problems similar to those which we faced in our first Opinion in *In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376 (Bankr. E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa. 1987), involving a less exotic but equally troubled industry, i.e., the steel industry as opposed to the world of independent television stations in issue in *Grant Broadcasting.* Presented are (1) A Motion of the Debtor seeking permission to continue to use cash collateral (hereinafter referred to as "the Cash Collateral Motion"); (2) The Debtor's Motion to continue approval of a Bailment Agreement between the Debtor and Westinghouse Electric Company (hereinafter referred to as "the Westinghouse Motion"); and (3) A Motion of the Debtor's principal secured creditor, Continental Bank (hereinafter referred to as "the Bank"), for relief from the automatic stay (hereinafter referred to as "the Stay Motion").

The facts of this case, in most ways, present a closer case than *Grant Broadcasting.* Nevertheless, we discern sufficient positive signs of a potential effective reorganization on the part of the Debtor that we are willing to accord it what amounts to a brief dispensation of survival to attempt to formulate a Plan. Therefore, we shall provisionally grant the Debtor's Cash Collateral Motion and the Westinghouse Motion and deny the Bank's Stay Motion, but with caveats which we hope will test whether the Debtor will in fact be able to present a confirmable Plan by the date of a continued hearing on September 30, 1987, on the Motions, and a requirement that the Debtor make escalating periodic payments to the Bank.

The Debtor filed its Petition in this case on March 9, 1987. On the same date, it

filed the Cash Collateral Motion and the Westinghouse Motion. These Motions were opposed from the outset by the Bank, and we took testimony on March 11 and 12, 1987, on the Motions. At the end of these hearings, the Court indicated that it would consider the hearing as a preliminary hearing and temporarily allow the Debtor to use cash collateral, subject to certain conditions, pending a final hearing. As a result, the Debtor and the Bank worked out the wording of an Order temporarily granting both the Motions until April 22, 1987, under certain conditions.

On April 22, 1987, having reported to us that the Debtor was considering certain offers to sell its two facilities, the parties agreed to extend the temporary Order to May 7, 1987, and thereafter it was extended further to May 28, 1987, and, finally, to June 9, 1987.

On June 9, 1987, although the undersigned was still feeling the effects of a sudden illness of the previous week, we began the consolidated hearing on the Motions. We planned to complete the hearing on June 15, 1987, but the persistence of illness caused us to continue it until June 22, 1987. At the close of the hearing, we entered an Order, dated June 23, 1987, extending the Order of March 12, 1987, and the automatic stay pending our disposition of these Motions; directing the parties to file Proposed Findings of Fact, Proposed Conclusions of Law, and supporting Briefs on or before July 13, 1987; and granting the parties an opportunity to file Reply Briefs on or before July 20, 1987.

On June 26, 1987, the Debtor filed a Motion requesting extensions of the respective 120–day and 180–day periods in which the Debtor exclusively may file a Plan and obtain acceptances of a Plan, respectively, pursuant to 11 U.S.C. § 1121(d). The Bank, the only opposing party, orally entered into a Stipulation with the Debtor, subsequently reduced to writing, that the exclusivity period to file a Plan could be extended to the later of sixty (60) days from the date of our decision on these Motions or September 23, 1987; and that the exclusivity period to obtain acceptances

of the Plan be extended until sixty (60) days thereafter. The Debtor agreed that it would not seek any further extensions of the exclusivity periods beyond these dates.

Because the factual findings in such proceedings are so important, it will be recalled that we asked the parties to make their submissions, *inter alia*, in the form of Proposed Findings of Fact and Conclusions of Law. Although we are not obliged to do so in deciding Motions, *see In re Campfire Shop, Inc.*, 71 B.R. 521, 525 (Bankr.E.D.Pa.1987), we shall, as in *Grant Broadcasting*, render our decision in this form.

## B. FINDINGS OF FACT

1. The main plant of the Debtor is located in Royersford, Pennsylvania, a Montgomery County, Pennsylvania, borough with a population of approximately 4,200, where it has been in business for almost a century.

2. The Debtor also owns and operates a division called Alburtis Machine Company (hereinafter referred to as "Alburtis"), which is situated in Alburtis, Lehigh County, Pennsylvania. Alburtis, a finish machine shop, is operated separately from the main plant, and relatively little testimony was adduced concerning its operations.

3. The Debtor is a closely-held company with about seventy (70) shareholders, most of whom are heirs and beneficiaries of former employees of the Debtor.

4. The Debtor's main plant is an open-die forge shop which produces a high-quality product. A large portion of its business involves forgings for both government and private industry which are used in nuclear plants and submarines.

5. Much of the Debtor's government contract work comes from Westinghouse. The products produced for Westinghouse are mainly parts for pumps and nuclear submarines, including the main rotors for the nuclear pumps.

6. David L. Freed, the Chairman of the Board and President of the Debtor, has been an employee of the Debtor for over thirty-five years.

7. The Debtor's main plant employs about seventy members of the Shipbuilders, Ironworkers, and Boilermakers Union.

8. The Debtor has had a business and borrowing relationship with the Bank for at least thirty years.

9. The Debtor's present total debt to the Bank encompasses three loans. The total monthly payments on those three loans is approximately $96,000.00, which includes approximately $35,000.00 in interest. At the time of its Chapter 11 filing, the Debtor owed the Bank a total of $4,961,354.19.

10. As collateral for the indebtedness owed by the Debtor to the Bank, the Bank obtained and duly perfected security interests in all of the Debtor's assets.

11. The Debtor stipulated that the liquidation value of the Bank's collateral is less than the amount of the debt owed to it. The Debtor also stipulated that, if called, the Bank's appraisers, who were in Court and prepared to so testify, would have testified that the going concern value of the assets of the business, although more than liquidation value, would still be likely to produce a sum less than the amount of the debt to the Bank. However, neither party presented any evidence as to the actual value of the Debtor's assets.

12. The Debtor owns the real estate on which its two plants are located. The Debtor's main plant contains substantial heavy-duty equipment needed to produce open-die forgings, and includes two presses, a 500–ton press and a 2,000–ton press, the latter of which is contended to be unique and valuable.

13. The Debtor is properly and adequately maintaining and insuring its realty and its machinery and equipment, naming the Bank as a loss payee under its insurance policies.

14. Debtor has lost money each year since and including 1982. In 1986, it had losses in each quarter and lost over $1,200,000.00 and, in 1985, it lost over $450,000.00.

15. The Debtor's losses were mainly attributable to depression in the steel industry generally and particularly in that portion of the industry involved in the manufacture of products used in nuclear industries.

16. By 1986, the Debtor was ensnared in a debt spiral situation where it found itself with an inadequate stock of steel to fill orders that it had received for its product. The Debtor did not have sufficient funds to purchase steel which would create sales at a high enough level that the trend could be reversed. This resulted in diminution of sales because less cash was available each month to purchase steel.

17. The Debtor concluded that, in order to reverse this debt spiral, it had to accumulate cash in order to purchase steel. To do this, it ceased making monthly payments of interest and principal to the Bank in July, 1986.

18. Consequently, the Debtor made no monthly payments at all to the Bank in August, September, October, November, 1986, January, 1987, or February, 1987. In December, 1986, it made an interest payment of approximately $34,000.00. After the filing of the Chapter 11 Petition in March, 1987, it made no payments to the Bank until July, 1987, when it made a payment of $15,000.00, and promised to continue making monthly payments to the Bank in this amount.

19. Prior to the filing of the Chapter 11 Petition, in fall of 1986, the Debtor took several actions which it projected would save it about $860,000.00 annually, including a ten (10%) percent reduction in administrative salaries and fringe benefits; a new union contract which featured a ten (10%) percent reduction in wages, revised work rules which would allow the Debtor more flexibility in assignments, and reduced fringe benefits; and reductions in energy expenditures.

20. In addition, the Debtor negotiated the Bailment Agreement with Westinghouse, pursuant to which Westinghouse was to purchase raw materials for its orders, thus saving the Debtor capital expenditures for the said materials.

21. At the March, 1987, hearings, the Debtor presented a projected Profit and

Loss Statement beginning in March, 1987, which predicted modest profits in March and the following months, e.g., $25,057.00 for March, 1987; $68,991.00 for April, 1987; and $86,394.00 for May, 1987.

22. At the June, 1987, hearings, the Debtor presented its Actual Profit and Loss Statement through May, 1987, which showed somewhat less performance than had been projected, e.g., profits of only $234.00 for March, 1987; $54,056.00 for April, 1987; and $14,000.00 for May, 1987.

23. These figures were themselves questioned by the Bank's expert witness, David Carpenter of the Coopers and Lybrand accounting firm on several bases:

a. The initial reports of actual Profit and Loss for January, 1987, and February, 1987, had been "restated" to increase losses in these months from about $400,000.00 to over $500,000.00. It was hypotheorized by Mr. Carpenter that certain costs were attributed to January and February which should have been recorded in March, April, and May, to make the statements for March, April, and May look better than they actually were and to heighten the contrast between the Debtor's pre-petition and post-petition performance.

b. A substantial portion of the reported sales in April and May (almost forty (40%) percent) were recorded on the last day of the month, suggesting manipulation by the Debtor at the end of each month.

c. When the Debtor's performances were measured on a January through May basis, it showed a loss of $440,000.00, as opposed to the post-petition profits claimed by the Debtor.

24. The Debtor attributed its failure to meet its projections to the following unanticipated developments:

a. The inability to hire and qualify an inspector until July, 1987.

b. Delay in implementation of the Bailment Agreement with Westinghouse, which resulted in its impact being deferred until June and July, 1987.

25. Mr. Freed, although admittedly unable to fully explain the reasons for restatement of the Debtor's financial statements, denied any attempts at manipulation.

26. The Debtor has employed Norman A. Lavin of the Touche Ross & Co. accounting firm to review its financial records, test its hypotheses, and assist it in formulating a Plan.

27. While Mr. Lavin believed that certain slight adjustments should be made to the Debtor's financial records to "normalize" monthly expenditures, he contended that the Debtor's projections were realistic and he presented a rough draft of a Plan which he believed would be confirmable.

28. The Debtor called, among its witnesses, the Chairman of the Creditors' Committee, T.H. Maher Cornell, counsel for Philadelphia Electric Company, the Debtor's largest utility supplier; John Salamone, Mayor of Royersford; Henry Groton, a representative of the union; Anthony P. Cianci, the credit manager of Carpenter Technology, a creditor and vendor of steel to the Debtor; and David Smith, purchasing manager for Westinghouse. All of these witnesses strongly supported the Debtor's position on these Motions, and counsel for the Creditors' Committee appeared on one trial date to support the Debtor's position.

29. As indicated at Finding 18 *supra,* the Debtor commenced making monthly payments of $15,000.00 to the Bank in July, 1987.

30. Messrs. Freed and Lavin are both candid and competent, and we therefore find that, through their testimony and presentations, the Debtor has not and most probably will not intentionally present its financial affairs in such a manner as to attempt to mislead or deceive the court. While Mr. Carpenter's critiques display insight, we are not prepared to find that they discount the considerable improvement effected by the Debtor in its post-filing financial picture over its pre-petition position.

31. The Debtor will, as of June and July, experience the full impact of the Bailment Agreement with Westinghouse and the employ of the needed inspector. Therefore, we will only grant the Debtor's Mo-

tions until we have an opportunity to monitor the Debtor's financial developments through August, 1987.

32. With the added elements of continuing to allow the Bank to monitor the Debtor's financial picture, and requiring the Debtor to make increasing monthly payments to the Bank or obtain confirmation of a Plan in a short time-period, it is likely that the Bank will realize more funds than it would by requiring the Debtor to cease operations at this time.

33. The Bailment Agreement with Westinghouse is a necessary component to the Debtor's successful reorganization, the Bank presented no evidence or argument to the contrary.

## C. CONCLUSIONS OF LAW

1. The Bank, having met its burden of establishing the validity, priority, and extent of its liens, is an undersecured creditor, as its debt exceeds the value of its security, i.e., all of the Debtor's assets.

2. It is not required that a Debtor compensate an undersecured creditor for its costs of delay or lost "opportunity costs" in order to adequately protect the interests of the said creditor provided that the Debtor establishes that it has a reasonable prospect for effecting a successful reorganization and makes payments in a reasonable amount to the creditor.

3. The stability, good public image, and realistic recognition of what it must accomplish to do so displayed by the Debtor, and willingness of the Debtor here to make payments in some amount here convinces us that a successful reorganization is possible.

4. Since there is only a short period of time remaining in the Debtor's exclusivity period, the Debtor's ability to successfully reorganize will be manifested (or not manifested) shortly. In light of this fact and the conditions added by us, included the provisions that this Order shall be of limited duration, extensive monitoring shall be continued, and the Debtor shall be required to remit accelerated amounts of payments to the Bank, the interests of the Bank are and will be adequately protected.

5. The Bailment Agreement with Westinghouse is a necessary component of the Debtor's reorganization, and hence the Westinghouse Motion must be granted consistent with our inclination to grant the Debtors' Cash Collateral Motion and to deny the Bank's Stay Motion.

6. With the restrictions and conditions provided herein, the Debtor is able to meet its burden of proving that the Bank is adequately protected, and the Cash Collateral Motion will be provisionally granted at this time.

7. Since it is deemed to be adequately protected, the Bank lacks cause to terminate the automatic stay pursuant to 11 U.S.C. § 362(d)(1). Since the property secured is necessary to an effective reorganization, the Bank cannot succeed in terminating the stay, pursuant to 11 U.S.C. § 362(d)(2), at this time. However, the denial of this Motion shall also be provisional.

## D. DISCUSSION

The Debtor's Cash Collateral Motion, which is ultimately the most significant of the three Motions before the Court, is based upon 11 U.S.C. §§ 363(c)(1), (c)(2), and (e), which provide as follows:

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or

lease in accordance with the provisions of this section.

. . . . .

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest.

The Bank's Stay Motion is based upon 11 U.S.C. § 362(d), which provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

As we indicated in *Grant Broadcasting, supra,* central to both Motions is the determination of whether the Bank's security interests are adequately protected. 71 B.R. at 384. Hence, relevant to both Motions is 11 U.S.C. § 361, which describes "adequate protection" as the term is utilized in §§ 362 and 363, as follows:

Sec. 361. Adequate protection.

When adequate protection is required under section 361, 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

In a portion of our *Grant Broadcasting* Opinion expressly approved by the district court, slip op. at 6–9, we pointed out that the "upshot" of § 363(*o*) and § 362(g), which allocate the burdens of proof on such Motions, is that "the burden of the Debtor is stiffer on a § 363 Motion than it is in withstanding the Motion of a creditor ... [under] § 362" and therefore "if the Debtor is able to satisfy us that the creditor is adequately protected for purposes of § 363(c)(2), ... he will satisfy us as to § 362(d) also." *Grant Broadcasting, supra,* 71 B.R. at 385. See District Court slip op. at 8–9. Thus, our focus can be directed at §§ 363(c) and (e). If the Debtor meets its burdens under those statutory provisions, there is no real dispute that the Westinghouse Motion should be granted, as it assists the Debtor in its crucial quest to improve its cash flow, and that the Bank's Stay Motion should be denied, because the granting of the Bank's Motion would allow the Bank to destroy the very spark of life which the granting of the Cash Collateral Motion provides to the Debtor.

There is, of course, one notable distinction between the facts of *Grant Broadcasting* and those of the instant case. In that case, weighing the testimony of respective experts of the Debtor and the principal secured creditors, we found that an "equity cushion" of approximately $25 million and over twenty-seven (27%) percent existed. 71 B.R. at 386. Here, the Debtor has stipulated that the Bank is undersecured and hence there is, by definition, no

equity cushion. Compare *In re Mitchell, Mitchell v. Frankford Trust Co.*, 75 B.R. 593, 598 (Bankr.E.D.Pa.1987); and *In re Crompton*, 73 B.R. 800, 811 (Bankr.E.D. Pa.1987). Therefore, the Motions before us turn on the propriety of the reasoning in our "alternative ground for decision" in *Grant Broadcasting*, i.e., that "compensation 'for the delay in enforcing ... rights during the interim between the petition and confirmation of the plan,' *In re American Mariner Industries, Inc.*, 734 F.2d 426, 435 (9th Cir.1984), ... should not always be a factor in determining whether a creditor is adequately protected." *Id.* 71 B.R. at 388. For, if we adopted the *American Mariner* rationale here, it appears that we would be obliged to require the Debtor to immediately commence payments in excess of $100,-000.00 monthly to the Bank, or deny the Cash Collateral Motion and grant the Stay Motion.

However, rejecting the rationale of *American Mariner*, we concluded, in *Grant Broadcasting*, that

> it is far more significant in the weight of considerations as to whether a creditor is "adequately protected" to analyze the Debtor's prospects for a successful reorganization in Chapter 11. If these prospects are strong, ... then the measure of the secured creditor's adequate protection is the probability that the debtor will be able to propose an effective plan. *Id.*

Since the *Grant Broadcasting* decision, we have applied the precepts which we developed there on several occasions in consumer contexts, most notably in addressing Motions by undersecured mortgagees for relief from automatic stays. In rejecting the argument that a failure to make payments to the creditor over at least some period of time should, *ipso facto*, result in relief to a secured creditor from the automatic stay, we stated as follows in *In re Tashjian*, 72 B.R. 968, 973 (Bankr.E.D.Pa. 1987):

> [W]e believe that determination of whether a secured lender receives "adequate protection" from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan. While of course the last element requires some analysis of the Debtor's payment performance, this element should not be isolated from the other elements and utilized alone as a basis to deprive a debtor of one of the most valuable tools with which the bankruptcy filing equips him or her [the automatic stay].

We have applied these principles in three consumer cases decided thereafter. First, in *Crompton, supra*, 73 B.R. at 809–12, we denied a stay motion in a case where a debtor-co-mortgagor had substantially performed a potentially-feasible plan to liquidate the entire secured portion of the mortgagee's claim. Secondly, in *Mitchell, supra*, 75 B.R. at 597–600, we denied a stay motion where the debtor-mortgagors, despite a very poor past payment record, presented a financial picture which rendered the presentment of a potentially-feasible plan to liquidate the mortgagee's entire allowed secured claim likely. Finally, in *In re Kessler, Kessler v. Merrill Lynch Mortgage Corp.*, 76 B.R. 434, 437–39 (Bankr. E.D.Pa.1987), we granted a mortgagee's stay Motion, even where an extended duration of the stay of only about two months was sought, where the debtor was in Chapter 7, and hence proposed no plan, offering as protection to the mortgagee only a promise to make double mortgage payments beginning the month following the hearing after four years of non-payment, an offer which we classified "as both too little and too late." At 438. *Compare In re Paolino*, 72 B.R. 555 (Bankr.E.D.Pa.1987) (relief granted to permit foreclosure on properties that were not shown to produce sufficient income to allow reorganization); *In re 6200 Ridge, Inc.*, 69 B.R. 837, 842–44 (Bankr.E.D.Pa. 1987) (stay relief granted where debtor was a non-asset corporation out of possession of asset pre-petition); *In re Diaconx Corp.*, 69 B.R. 333,

338–40 (Bankr.E.D.Pa. 1987) (use of cash collateral by defunct company to purchase transcript to pursue appeal in case against secured creditor denied).

If any parallel can be drawn between the instant case and the foregoing consumer cases, we would place the prospects of the Debtor here as somewhere between those of the *Crompton* and the *Mitchell* debtors. The performance of the Debtor here has certainly been more substantial than the Debtors in *Mitchell,* but performance is still at the "promise" stage, rather than the partial-performance stage, as in *Crompton.* The *Mitchell* Debtors' ability to perform had less objective difficulties, but more subjective difficulties, than those of the Debtor here. To put it another way, on paper, the Mitchells' performance looked like a safer bet than that of the Debtors here. However, the Mitchells' performance thus far had been "absymal," whereas the Debtor here impressed us as displaying a high degree of motivation and effort, but as having significant obstacles beyond its control to overcome. The Debtor is nowhere nearly so unimpressive, in performance or prospects, as was the debtor in *Kessler.*

Very significant is the Debtor's willingness to commence payments to the Bank, especially in light of the absence of the "equity cushion" present in *Grant Broadcasting.* We do conclude, however, that the Debtor must accelerate these payments, beginning in September, 1987, by $15,000.00 monthly until it is remitting a sum equal to the regular monthly payments due to the Bank as of February, 1988. This should not be difficult if the Debtor really is in a state of recovery.

We continue to believe that our endorsement, in *Grant Broadcasting,* of much of the reasoning employed by the Fifth Circuit panel and court en banc in *In re Timbers of Inwood Forest Associates, Ltd.,* 793 F.2d 1380 (5th Cir.1986), *reinstated,* 808 F.2d 363 (5th Cir.1987) (en banc), concerning the significance of the prospects of reorganization in the decision-making process in such cases was correct.

With respect to the panel decision, we base our endorsement on the principle that the Bankruptcy Code must be construed consistently with comparable provisions of the Bankruptcy Act unless Congress expressed a clear indication to effect a change in enacting the Code. *See Kelly v. Robinson,* —— U.S. ——, 107 S.Ct. 353, 358–60, 93 L.Ed.2d 216 (1986); and *Midlantic National Bank v. New Jersey Dep't of Environmental Protection,* 474 U.S. 494, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986). As the *Timbers* panel painstakingly points out, "the subject of periodic postpetition interest payments for undersecured creditors was not raised in the testimony or prepared statement of a single witness" in the hearings prior to the enactment of the Code. 793 F.2d 1395. *See generally, id.* at 1393–1401. We know of no pre-Code case wherein such payments were required. In our view, requiring such payments would run directly counter to the well-established principle that post-petition interest is collectible by creditors only where the requirements of 11 U.S.C. § 506(b) are met, or where the debtor is solvent and equitable considerations favor a payment. *See Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946); and *In re Shaffer Furniture Co.,* 68 B.R. 827, 830 (Bankr.E.D.Pa.1987); and O'Neill, *Adequate Protection and Postpetition Interest in Chapter 11 Proceedings,* 56 AM. BANKR.L.J. 251 (1982).

The decision of the court en banc in *Timbers* responds in meaningful fashion to the arguments of the dissent that rejection of the rationale of *American Mariner* will necessarily harm undersecured creditors by indefinitely tying up their money. 808 F.2d at 382–83. The court en banc responds that, if the " 'effective reorganization' standard" is "given meaning" by bankruptcy courts in deciding Motions pursuant to 11 U.S.C. §§ 1112(b) and 1121(d), there is no reason to fear unjustified delays. *Id.* at 370–72.

We totally agree with this latter observation of the en banc majority and have attempted to commit ourselves to an efficien-

cy in rendering decisions in all matters which come before us. We intend to grant 1112(b) Motions in cases which have been dormant too long. We do not intend to liberally grant repeated 1121(d) Motions. Thus, if a debtor cannot convince his creditors to accept a Plan of his making within a reasonably short time, the creditor or creditors can prepare and, if in sufficient number and/or holding a sufficient amount of debts, compel the confirmation of a Plan which satisfies their wishes. Thus, the interests of *all* creditors, including of course those creditors having sufficient presence to make or break a Plan, will be served. *Compare,* Comment, *"Adequate Protection" and the Availability of Postpetition Interest to Undersecured Creditors in Bankruptcy,* 100 HARV.L.REV. 1106, 1121–24 (1987) (analysis of whether "postpetition interest" as in *American Mariner* must be paid should focus on equitable treatment of all creditors).

In the record presented before us, we find cause for cautious optimism that the Debtor will be able to present a confirmable Plan which will result in a betterment of the financial status of all of its creditors, including the Bank. The Debtor's management has, perhaps at an unreasonably late juncture, faced up to its need to make substantial adjustments if it is to survive. The negotiation of a new collective bargaining agreement, the success of which was doubtless furthered by the willingness of the Debtor's management, from Mr. Freed on down, to take a pay-cut, was an important accomplishment. The negotiation of the Bailment Agreement with Westinghouse was another important accomplishment. Particularly impressive about this Debtor was its stability and acceptance of changes necessary for sustenance by its labor force and its community. Its production of a high-quality product is also impressive. Quality production would seem

an impossible accomplishment for a mismanaged manufacturing plant.[1]

There was considerable dispute as to whether the Debtor had actually "turned itself around" financially subsequent to the bankruptcy filing in March, 1987, or whether it was merely manipulating its financial records in such a manner as to make it appear that an unattainable turn-around had occurred. Frankly, we detected a lack of certainty in the counter-views of both Mr. Lavin and Mr. Carpenter, the "dueling accountants." We believe that only after the profit and loss statements are produced and analyzed for June, July, and August, 1987, will we be able to determine whose view is the more accurate. By July, the Bailment Agreement with Westinghouse and the utilization of the Debtor's newly-hired inspector will be in place. We will be skeptical if the figures are disappointing, and the Debtor attempts to invoke new "reasons" to explain why figures for these months are not conclusive. Explanations (or excuses) aside, the Debtor now must begin to produce real profits. Thus, one of our requirements is the careful production of records for these periods, under the monitoring eye of Mr. Carpenter and his colleagues.

There is also a considerable dispute as to whether the Debtor can formulate a confirmable Plan. We reiterate that no further extensions of the exclusivity period will be accorded to the Debtor and therefore the Plan must appear within two months, or the Bank will have its opportunity to prepare a competing, and possibly a liquidating, Plan. If no confirmable Plan emerges, the Bank's reliance upon *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 831–33 (Bankr.S.D.N.Y.1982), would be most apt. However, it is too soon to apply the reasoning of the *Pine Lake* case at this pre-Plan juncture and declare the

---

**1.** However, we recognize the very discrete limitations of the relevance of testimony from such witnesses as the Mayor of Royersford and the union representative. We are limited in our ability to look at the "big picture," and cannot frustrate the Bank's legitimate property interests because of the need to save jobs and to save the tax base of the Borough of Royersford. Furthermore, such perspectives are elusive. It would be as logical to base our decision upon a determination of whether it would constitute a real loss to humanity if a dirty factory producing parts for nuclear submarines and other products furthering the use of nuclear power is eliminated.

Debtor's chances of producing and gaining acceptance of a Plan to be doomed. Rather, similar to the resolution in *Grant Broadcasting*, we shall require the Debtor to produce and file a Plan on or before September 23, 1987, shortly before its exclusivity period is due to expire. Also, rather than denying any of the Motions before us, we shall simply continue their final disposition until a period shortly after the Plan is produced, i.e., September 30, 1987, when we shall also schedule a hearing on the Debtor's Disclosure Statement.

We note several points of comparison between the *Grant Broadcasting* case and this case, which made the request of the Debtor there, generally more palatable than the request of the Debtor here, in several respects more questionable than that of the Debtor here. First, the independent television industry in which the Debtor there was engaged was both new and extremely volatile. The possibility existed that the Debtors there would continue to lose millions of dollars monthly and that their relatively small stock of hard assets would result in the decimation of the value of the Debtors' assets, and, consequently, the secured parties' collateral. Here, the industry is time-tested and this lends an element of relative stability, which checks the potential of great additional losses inuring to the Bank's collateral on a short-term basis.

Secondly, the Debtors in *Grant Broadcasting* had opposition from nearly every quarter on a variety of issues. Production of a confirmable Plan was frankly stated, by the largest groups of unsecured as well as secured creditors, to be impossible. Lo and behold, by aiming lower and agreeing to the relinquishment of its equity by the present ownership, it now appears that a Plan will be jointly presented by the Debtors and the creditor-interests in *Grant Broadcasting*. The Debtor here may be well-advised to aim lower and be solicitous to the Bank in forming its proposed Plan and it, too, may succeed in convincing the Bank that a Plan which will serve all interests involved can be proposed.

We also observe that success in *Grant Broadcasting* here, if it should come to fruition, will be testimony to the wisdom of *Timbers*. By giving a debtor a chance to develop a resolution which is ultimately palatable to all involved, the seemingly-impossible task of producing a confirmable Plan can be achieved.

As in *Grant Broadcasting*, our granting of the Debtor's Cash Collateral Motion is provisional, i.e., for only about sixty days more, until September 30, 1987. *Compare Grant Broadcasting*, 71 B.R. at 389, 390. *See also In re All-Way Services, Inc.*, 73 B.R. 556, 578 (Bankr.D.Wis.1987); *In re Xinde Int'l, Inc.*, 13 B.R. 212, 215 (Bankr. D.Mass.1981).

Unlike *Grant Broadcasting*, we shall not deny the Bank's Motion outright, although we will also not insert a clause automatically granting relief to the Bank under § 362(d) if no Plan is timely filed or confirmed, as the Bank urges. Rather, we shall merely continue disposition of this Motion until September 30, 1987, also.

We shall continue in effect all aspects of the Order of March 12, 1987, which include a restriction on the Debtor's use of Cash Collateral to operations in its ordinary course of business and supplying of financial data on a regular basis to the Bank's accountants. *See Bankwest, N.A. v. Todd*, 49 B.R. 633, 634–35, 636 (D.S.D.1985); *All-Way, supra*, 73 B.R. 577, 578; and *Grant Broadcasting*, 71 B.R. at 389, 390.

Unlike *Grant Broadcasting*, where the need to do so was lessened by our finding of an equity cushion, we shall also require the Debtor to make certain periodic payments to the Bank. We assume that the Debtor made the $15,000.00 payments proposed in July, 1987. We will further order that the Debtor increase these payments in increments of $15,000.00 until the amount of the full monthly payments of about $96,000.00 monthly is reached, beginning in September, 1987,[2] or until a Plan is con-

**2.** Thus a payment of $30,000.00 is required in September, 1987; $45,000.00 in October, 1987; $60,000.00 in November, 1987; $75,000.00 in December, 1987; $90,000.00 in January, 1988; and regular monthly payments commencing in February, 1988.

firmed, payments to be due on the fifteenth (15th) day of the months. *See All-Way, supra,* 73 B.R. at 577 (debtor required to resume regular monthly payments immediately).

An Order consistent with the foregoing Opinion shall issue.

## ORDER

AND NOW, this 5th day of August, 1987, after trial of March 11, 1987, March 12, 1987, June 9, 1987, and June 22, 1987, on the Motion of Continental Bank (hereinafter referred to as "Continental") for Relief from Automatic Stay and for Ancillary Relief (hereinafter referred to as "the Stay Motion"); the Debtor's Motion to be permitted to continue to use Cash Collateral (hereinafter referred to as "the Cash Collateral Motion"); and the Debtor's Motion for Approval of its Bailment Agreement with Westinghouse Electric Company (hereinafter referred to as "the Westinghouse Motion"), it is hereby ORDERED as follows:

1. The Stay Motion is provisionally DENIED, and the Automatic Stay shall remain in full force and effect until September 30, 1987, at which time a continued hearing on the Stay Motion will be conducted, per paragraph five *infra.*

2. The Cash Collateral Motion and the Westinghouse Motion are provisionally GRANTED, subject to the following conditions:

a. Cash Collateral is authorized to be used only for the Debtor's operating expenses incurred in the ordinary course of its every-day business.

b. The Bank shall have a perfected security interest in and to all of the Debtor's now owned and hereafter acquired personal and real property, including, without limitation all inventory, contract rights, accounts receivable, general intangibles, accounts, deposits, machinery, equipment, furniture, fixtures, all proceeds of the foregoing, as well as continuing mortgages on all of the Debtor's real estate. Both parties reserve all rights, remedies, and defenses with respect to the amount of the secured portion of Bank's claim against Debtor, including, without limitation, Bank's option to exercise its rights under Section 1111(b) of the Bankruptcy Code, if so desired by Bank.

c. The Bank or its agents may from time to time and after reasonable notice, inspect, inventory, review and audit, at its own expense, the assets and books of the Debtor, as well as have complete access to all work papers whether prepared or utilized in connection with any audits by the Debtor's independent auditors since December 31, 1985, and the Debtor shall reasonably cooperate with the Bank or its agents.

d. The Debtor shall continue to deliver copies of the following to Lender, its counsel, and to the employee of Coopers & Lybrand as may be designated by Lender (by one (1) day delivery service), certified as true and correct to the best of their information, knowledge and belief by the President and the Comptroller of the Debtor:

(1) On every Monday hereafter, (A) a listing of all accounts receivable as of the prior Friday, together with an aging, and (B) a list of all receipts and disbursements for the prior week;

(2) Reports of inventory at the lower of cost or market value on a bi-weekly basis;

(3) On or before the 15th day of each month, a balance sheet and statement of operations for the previous month, as well as an aging of accounts receivable, accounts payable, and certifications of the amount of inventory (at the lower of cost or market value) at month's end.

e. On or before the 15th day of each month, pending Confirmation of a Plan, the Debtor shall remit payments to the Bank in at least the following amounts:

| (1) | July and August, 1987 | $15,000.00 |
| (2) | September, 1987 | 30,000.00 |
| (3) | October, 1987 | 45,000.00 |
| (4) | November, 1987 | 60,000.00 |
| (5) | December, 1987 | 75,000.00 |
| (6) | January, 1988 | 90,000.00 |
| (7) | Regular monthly payments. February, 1988 and thereafter— | |

3. The Debtors shall prepare and file a proposed Plan of reorganization and a Disclosure Statement on or before September 23, 1987, and notify all interested parties of same on or before that date. A hearing on the Disclosure Statement shall be conducted per paragraph five *infra*.

4. The provisions of paragraph two (2) of this Order and any rights granted or obligations imposed pursuant hereto shall only be effective through and until September 30, 1987, except where otherwise indicated. At that time a hearing on the issue of whether to continue relief pursuant to the aforesaid Motions shall be conducted per paragraph five *infra*.

5. The hearing on the Debtor's continued use of cash collateral; continued right to engage in the Bailment Agreement with Westinghouse; the continued hearing on the Stay Motion; and the hearing on the Debtor's Disclosure Statement shall be conducted on

WEDNESDAY, SEPTEMBER 30, 1987, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.